Michael REX, et al.

v.

CHASE HOME FINANCE LLC., et al.

Case No. SACV 12–0609 DOC (RNBx).

United States District Court,
C.D. California.

Nov. 19, 2012.

Bruce Alan Harbin, Harbin & McCarron, Santa Ana, CA, Daniel J. Bulfer, Jon R. Mower, Mower and Carreon LLP, Irvine, CA, for Plaintiffs.

Peter Obstler, John Anthony Polito, Zachary J. Alinder, Bingham McCutchen LLP, San Francisco, CA, for Defendant.

## PROCEEDINGS: (IN CHAMBERS): ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

DAVID O. CARTER, District Judge.

Before the Court is a Motion to Dismiss ("Motion") filed by Defendants JPMorgan Chase Bank NA, Chase Home Finance LLC, and Chase Home Finance Inc. (Dkt. 15). After considering the moving, opposing, and replying papers, as well as supplemental briefs, the Court GRANTS IN PART and DENIES IN PART the Motion.[1]

 This case involves an issue of first impression,[2] namely, whether California Civil Procedure Code Section 580b applies to bar Defendants, which are mortgage lenders, from collecting a deficiency[3] where Plaintiffs have sold their home after defaulting on their mortgage and with the

---

1. The Court finds the matter appropriate for decision without oral argument. Fed R. Civ. P. 78; Local R. 7–15.

2. This Court's own extensive research has found no published California court opinion nor published or unpublished federal district court opinion addressing whether Section 580b applies to short sales. In addition, in their Response to this Court's order providing the parties with another opportunity to present case law on this issue, Defendants state that "no court has expressly ruled that § 580b does not apply to short sales," nor "that § 580b does apply to short sales." Defs.' Response (Dkt. 27) at 1–2.

3. A "deficiency" is "that part of a debt secured by mortgage not realized from sale of mortgaged property." *In re Prestige Ltd. P'ship–Concord*, 223 B.R. 203, 209 (Bankr. N.D.Cal.1998) *aff'd by* 234 F.3d 1108 (9th Cir.2000).

consent of Defendants in a transaction commonly referred to as a "short sale." [4] This case also presents a novel issue addressed by only two other courts regarding whether Section 1818(i)(1) of Title 12 of the United States Code divests this court of jurisdiction.

## I. Background

The gravamen of this putative class action is that Plaintiffs, who are borrowers, sold their home for an amount insufficient to pay off their mortgage—a "short sale"—and eschewed other options like foreclosure because they relied on representations by Defendants promising to release Plaintiffs from the obligation to pay this short sale deficiency. After the short sale, Defendants did not release Plaintiffs but rather sought to collect the short sale deficiency and reported Plaintiffs' failure to pay it to credit reporting agencies.

### a. In 2006, Plaintiffs obtain a purchase money mortgage from Defendants

Defendants are JPMorgan Chase Bank, N.A. ("Defendant Chase NA"), Chase Home Finance LLC ("Defendant Chase LLC"), and Chase Home Finance Inc. (collectively, "Defendants").

Plaintiffs Michael and Naomi Rex ("Plaintiffs") are "borrowers who obtained financing for the purchase of residential housing in California through Defendants' loan services." FAC ¶ 2. In 2006, Plaintiffs "financed the purchase of their home," which was a "single family residence," with a loan from Defendant Chase NA. *Id.* at ¶ 5. Defendant Chase NA "was the mortgage holder and the mortgage was thereafter held and administered by" Defendant Chase LLC. *Id.*

### b. In 2009, Plaintiffs are unable to pay their mortgage

In 2009, Plaintiffs experienced "decreased income" and realized they "would not be able to satisfy the monthly payment demands of the mortgage lender." *Id.* at ¶ 6. At that time, Plaintiffs owed approximately $310,000 on their mortgage. *Id.* at ¶ 6.

Plaintiffs "initially tried to negotiate a loan modification" with Defendant Chase LLC, but it "was unwilling." *Id.* at ¶ 8. Plaintiffs "continued to make timely monthly payments on their mortgage." *Id.*

### c. Defendant Chase LLC conditions a short sale on Plaintiffs defaulting on their mortgage

"Since they were denied a loan modification and they had no other viable financial option, Plaintiffs elected to pursue [a] short sale ... as opposed to allowing the property to go into foreclosure." *Id.* The FAC defines a "short sale" as "a transaction wherein the selling price of the residence is for an amount insufficient to pay off the amount of the loan on the property leaving the sale 'short' of a full payoff of the loan." FAC at ¶ 2.

Defendant Chase LLC informed Plaintiffs that, before it "would approve any short sale, it would be necessary that Plaintiffs be at least thirty days late on their mortgage payments." *Id.*

### d. In a December 10, 2009, letter (Exhibit 2), Defendants agree to release Plaintiffs of the short sale deficiency

"Chase [LLC] agreed to accept [Plaintiffs'] short sale" and "documented the acceptance of the short sale in a letter to

---

**4.** A "short sale" is the "voluntary" sale of mortgaged property by the borrower where the borrower "secures the agreement of the [lender] to release the mortgage upon a bona fide sale to a third party for an agreed upon price below the mortgage loan balance." 2 The Law of Real Estate Financing § 12:10, Short sales.

[Plaintiffs on] December 10, 2009" in which Defendant Chase LLC "confirmed its agreement to 'release its security interest(s) in the . . . property upon receipt of $3,000. . . .' " FAC ¶ 9; *see also id.* at ¶¶ 39, 45, 48–49.

In a letter dated December 10, 2009, attached to the original complaint as Exhibit 2, Defendants state that:

> You have informed Chase that you would like to sell the reference[d] property for an amount that is not sufficient to pay the Loan in full. In connection with the sale, you have requested that Chase release the lien (the "Lien") on the Property which secures the Loan and the Note. Chase agrees to do so, subject to all of the following conditions:
>
> 1. Payment to Chase of certified funds of not less than $3,000.00. . . .
> 2. Receipt by Chase of a signed copy of this letter whereby you promise to pay Chase, its successors or assigns, the sum of $2,000.00 by 12/30/09.
>
> . . . .
>
> Chase's agreement to release the Lien and Note is valid only in connection with the Purchase Contract. . . .

Compl. (Dkt. 1) Ex. 2.

**e. Another December 10, 2009, letter (Exhibit 1) states that the "customer is still responsible for all deficiency balances per the terms of the of the original loan"**

In *another* December 10, 2009, letter attached to the original Complaint at Exhibit 1, Defendants states that:

> This letter is to confirm that JPMorgan Chase Bank, N.A., . . . agrees to accept the following:
>
> **SHORT SALE** on the above account. JPMorgan Chase Bank, N.A., . . . agrees to release it[s] security interests in the above collateral upon receipt of $3,000.00 in certified U.S. funds. . . .

This amount is for the release of JPMorgan Chase Bank, N.A., . . . security interest only. The customer is still responsible for all deficiency balances per the terms of the original loan documents.

Compl. (Dkt. 1) at Ex. 1.

**f. After the short sale, Defendants seek to collect the deficiency**

"Within several months" of the short sale, Defendant Chase LLC sought "a deficiency balance of more than $56,000.00 from Plaintiffs." FAC ¶ 41. Defendant Chase LLC "assigned the collection of this unlawfully claimed deficiency balance 'debt' to debt collectors," who "have continued to . . . pursue collection." *Id.* at ¶¶ 11, *see also id.* at ¶ 73(b).

Due to these collection efforts, Plaintiffs "are being forced to, or will be forced to, make payments unauthorized by law and contrary to the express agreement of and representations of Defendant Chase [LLC]." *Id.* at ¶ 42.

**g. Defendants report Plaintiffs' failure to pay the short sale deficiency to creditors, resulting in inaccurate credit histories**

Defendants "[f]alsely and deceptively report[ed] . . . the deficiencies of Plaintiffs . . . to credit reporting agencies as 'late,' 'charged off,' 'collection,' or other derogatory status . . . when in fact under California Code of Civil Procedure 580b no such personal liability exists." FAC ¶¶ 63, 63(d); *see also id.* at ¶¶ 73, 73(e).

"As a proximate result of the foregoing, Plaintiffs . . . have been damaged and have suffered detriment in that they have been subjected to . . . listing of . . . unlawful and improperly claimed 'debt' with credit reporting agencies." FAC ¶ 46, *see also id.* at ¶¶ 49, 56. For example, Defendant Chase LLC "caused Plaintiffs . . . to suffer and sustain damages in degraded credit

histories." *Id.* ¶ 60. Plaintiff also has suffered "damage to [Plaintiffs'] credit reports and credit ratings." *Id.* ¶¶ 74(b), 75(b).

### h. On April 13, 2011, Defendant Chase NA and the OCC enter into a Consent Cease and Desist Order ("2011 Consent Order")

On April 13, 2011, Defendant Chase NA consented to the issuance of and entered into a "Consent Cease and Desist Order" ("2011 Consent Order") issued by the Comptroller of the Currency ("OCC"). Defs.' Request for Judicial Notice ("RJN") (Dkt. 16) Ex. A (2011 Consent Order) at 1. The 2011 Consent Order states that it is "a final order issued pursuant to 12 U.S.C. § 1818(b)." *Id.* Ex. A at Art. XIII § 2(8).

By entering into this 2011 Consent Order, Defendant Chase NA "committed to taking all necessary and appropriate steps to remedy the . . . unsafe or unsound practices identified by the OCC, and to enhance [Defendant Chase NA] residential mortgage servicing and foreclosure processes." *Id.* Ex. A at 1–2. The Consent Order also states that the Comptroller finds and Defendant Chase NA "neither admits nor denies" that Defendant Chase NA "engaged in unsafe or unsound banking practices." *Id.* Ex. A at 2–3.

The 2011 Consent Order provides that Defendant Chase NA "shall submit to" the OCC, and, "upon adoption" by the OCC, "implement"[5] the following:

- "Compliance Program," which "shall" include "processes to ensure that . . . compliance programs have the requisite authority . . . so that . . . deficiencies" in Defendant Chase NA's "Loss Mitigation" activities are "identified and promptly remedied." Defs.' RJN (Dkt. 16) Ex. A at Art. IV, §§ (1), (1)(*o*).

5. Defs.' RJN (Dkt. 16) Ex. A at Art. XI, § (1).

- "plan for operation of its management information system . . . to ensure the timely delivery of complete and accurate information" regarding "Loss Mitigation activities." *Id.* Ex. A at Art. VIII. .

- "plan . . . for ensuring effective coordination of communications with borrowers . . . related to Loss Mitigation . . . and foreclosure activities." *Id.* Ex. A at Art. IX, § (1).

- "plan" to "reimburs[e] or otherwise appropriately remediat[e] borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury." *Id.* Ex. A at Art. VII, § (5)(a).

The 2011 Consent Order defines "loss mitigation activities" to "include . . . activities related to special forbearances, modifications, short refinances, *short sales,* cash-for-keys, and deeds-in-lieu of foreclosure." *Id.* Ex. A at Art. III § (2) (emphasis added).

### i. In a June 21, 2011, Financial Remediation Framework ("2012 Framework"), the OCC issues recommendations to Defendant Chase NA's independent consultants

Defendants have submitted a document titled "June 21, 2012 Financial Remediation Framework" ("2012 Framework"). *See* Defs.' RJN (Dkt. 16) Ex. G.

The 2012 Framework provides that "independent consultants" for the "mortgage servicers" that entered into the 2011 Consent Order "will use the Framework to recommend remediation" and the mortgage "servicers will prepare remediation plans based on [those] recommendations." Defs.' RJN (Dkt. 16) Ex. G at 1.

The 2012 Framework states that it:

- "provides examples of where compensation or other remediation is required for financial injury" that these independent consultants "will use." *Id.*

- One such example is that a servicer "[s]uspend foreclosure where appropriate, correct servicer record for amounts in error and/or reimburse borrower for amounts paid in error, plus interest; and where required, correct credit reports and pay $500 for credit reporting error." *Id.* at 5 (text at column "No. 13"). This example appears under the heading "FORECLOSURE IN PROCESS" and describes the "[s]ervicer error" as one "that did not directly cause foreclosure, but did directly result in financial injury to borrower." *Id.*

### j. Plaintiffs file their First Amended Complaint

On July 30, 2012, Plaintiffs filed their First Amended Complaint ("FAC"), which brings the following eight claims against all Defendants:

(1) First claim for "Breach of Contract";

(2) Second claim for "Promissory Estoppel";

(3) Third claim for "Promissory Fraud";

(4) Fourth claim for "Negligent Misrepresentation";

(5) Fifth claim for "Violation of Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*" ("CLRA claim");

(6) Sixth claim for "Violation of Rosenthal Fair Debt Collection Practices Act, Cal. Civ.Code § 1788 *et seq.*" ("Rosenthal claim");

(7) Seventh claim for "Violation of Consumer Credit Reporting Agencies Act, Cal. Civ.Code § 1785.1 *et seq.*" ("CCRAA claim"); and

(8) Eighth claim for "Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*" ("UCL claim").

FAC (Dkt. 12).

Plaintiffs' "Prayer for Relief" requests, among other things, remedies such as:

- An injunction prohibiting Defendants from sending "false," "confusing, contradictory and erroneous," "unconscionable," or "deceptive[ ]" communications to borrowers in connection with short sales. FAC ¶¶ 58, 73(a)–(d), 74(c), 75(c), 78; *id.* at 38 (Prayer for Relief ¶¶ 7, 10). This is one of several forms of relief Plaintiffs seek for their CCRAA and UCL Claims.

- "[M]oney or property" received from Plaintiffs by Defendants due to "false[ ] and deceptive[ ] represent[ations]" about their post-short sale deficiency. *Id.* at ¶ 76.

- An order requiring Defendants to "contact all major credit reporting agencies and notify them that the claimed 'deficiency balances' . . . are fully discharged debts as of the date allegedly incurred." *Id.* at Prayer for Relief ¶¶ 7, 10.

- "recovery of economic damages sustained . . . as a result of damage to [Plaintiffs'] credit rating." *Id.* at Prayer for Relief ¶¶ 3–6.

## II. Legal Standard

### a. Federal Rule of Civil Procedure 12(b)(1)

 Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if the court lacks subject matter jurisdiction to adjudicate the claims. Once subject matter jurisdiction is challenged, the burden of proof is placed on the party asserting that jurisdiction exists. *Scott v.*

*Breeland,* 792 F.2d 925, 927 (9th Cir.1986) (holding that "the party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists"). Accordingly, the court will presume lack of subject matter jurisdiction until the plaintiff proves otherwise in response to the motion to dismiss. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

■■■ In evaluating a Rule 12(b)(1) motion, the question of whether the court must accept the complaint's allegations as true turns on whether the challenge is facial or factual. A facial attack is one in which subject matter jurisdiction is challenged solely on the allegations in the complaint, attached documents, and judicially noticed facts. *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004). In a facial attack, the moving party asserts that the lack of federal subject matter jurisdiction appears on the "face of the pleadings." *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir.2003). In the case of a facial attack, the court is required to accept as true all factual allegations set forth in the complaint. *Whisnant v. United States,* 400 F.3d 1177, 1179 (9th Cir.2005).

In contrast, a factual attack (or a "speaking motion") is one in which subject matter jurisdiction is challenged as a matter of fact, and the challenger "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air,* 373 F.3d at 1039. In assessing the validity of a factual attack, the court is not required to presume the truth of the plaintiff's factual allegations. *Id.* Rather, the court evaluates the allegations by reviewing evidence outside of the pleadings. *Id.*

### b. Federal Rule of Civil Procedure 12(b)(6)

■■■ Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). On a motion to dismiss, this court accepts as true a plaintiff's well-pled factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir.2008). The court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

■■■ In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the complaint and material properly submitted with the complaint. *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). Under the incorporation by reference doctrine, the court may also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by* 307 F.3d 1119, 1121 (9th Cir.2002).

■■■ A motion to dismiss under Rule 12(b)(6) can not be granted based

upon an affirmative defense unless that "defense raises no disputed issues of fact." *Scott v. Kuhlmann,* 746 F.2d 1377, 1378 (9th Cir.1984). For example, a motion to dismiss may be granted based on an affirmative defense where the allegations in a complaint are contradicted by matters properly subject to judicial notice. *Daniels–Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir.2010). In addition, a motion to dismiss may be granted based upon an affirmative defense where the complaint's allegations, with all inferences drawn in Plaintiff's favor, nonetheless show that the affirmative defense "is apparent on the face of the complaint." *See Von Saher v. Norton Simon Museum of Art at Pasadena,* 592 F.3d 954, 969 (9th Cir.2010).

 Additionally, Federal Rule of Evidence 201 allows the court to take judicial notice of certain items without converting the motion to dismiss into one for summary judgment. *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994). The court may take judicial notice of facts "not subject to reasonable dispute" because they are either: "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. 201; *see also Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001) (noting that the court may take judicial notice of undisputed "matters of public record"), *overruled on other grounds by* 307 F.3d 1119, 1125–26 (9th Cir.2002). The court may disregard allegations in a complaint that are contradicted by matters properly subject to judicial notice. *Daniels–Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir.2010).

 Dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment.

*Jackson v. Carey,* 353 F.3d 750, 758 (9th Cir.2003); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (holding that dismissal with leave to amend should be granted even if no request to amend was made). Rule 15(a)(2) of the Federal Rules of Civil Procedure states that leave to amend should be freely given "when justice so requires." This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990).

### III. Discussion

Defendants advance the following alternative legal theories: (1) 12 U.S.C. § 1818(i)(1) divests this Court of jurisdiction over the entire case; (2) the Court should decline to exercise jurisdiction under either the primary jurisdiction doctrine or deny relief under the equitable abstention doctrine; (3) Plaintiffs lack Article III standing to bring their breach of contract claim and lack statutory standing to bring their UCL claim; (4) Cal.Civ. Proc.Code § 580b does not bar collection of a deficiency after a "short sale"; (5) the Federal Credit Reporting Act, 15 U.S.C. § 1681t(b)(1)(F), preempts Plaintiffs' claims; (6) Plaintiffs have failed to state a claim for breach of contract due to contradictory terms in two letters sent by Defendant and any alleged oral representations are barred by the statute of frauds; (7) Plaintiffs have failed to state a claim for promissory estoppel, promissory fraud, negligent misrepresentation, and a UCL violation due to the contradictory terms in these two letters because Plaintiffs' reliance on one of them was unreasonable; and (8) Plaintiffs' CCRAA claim is too conclusorily pled.

### a. 12 U.S.C. § 1818(i)(1) does not divest this Court of jurisdiction

Section 1818(i)(1) of Title 12 of the United States Code provides that federal

courts have jurisdiction to "require compliance" with cease and desist orders issued by certain federal banking agencies, but divests federal courts of jurisdiction to "affect by injunction or otherwise" or "modify" those cease and desist orders. 12 U.S.C. § 1818(i)(1). The parties dispute the meaning of the phrases in Section 1818(i)(1) regarding a federal court's jurisdiction to "affect by injunction or otherwise" or "modify" an OCC-issued cease and desist consent order. *See id.*

■■■ This Court holds that Section 1818(i)(1) does not divest a federal court of jurisdiction over a case brought by a nonparty to a federal banking agency's consent order where, as here, the consent order requires a defendant to create a *plan* to redress certain practices and this plan may or may not provide the same relief sought in the case brought by the non-party to the consent order. This Court first discusses the text of Section 1818(i)(1) and its role in the larger tripartite regime of judicial review of federal banking agencies' cease and desist orders. This Court then turns to Defendants' arguments.

### i. The text of Section 1818(i)(1) and its related Sections 1818(h)(2) and (c)(2)

Section 1818(i) is one sentence divided by a semicolon. Prior to the semicolon, Section 1818(i) provides the federal courts with jurisdiction in what this Court will refer to as the "Jurisdiction–Granting Clause":

Federal banking agency may ... apply to the United States district court ... for the enforcement of any ... order issued under this section or [other specified sections], and such courts shall have jurisdiction and power to order and require compliance herewith.

12 U.S.C. 1818(i)(1). After the semicolon, in what this Court will refer to as the "Jurisdiction–Divesting Clause," Section 1818(i)(1) states that, with some exceptions not invoked by any party here:

... no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any ... order under any such section, or to review, modify, suspend, terminate, or set aside any such ... order.

*Id.*[6]

■■■ As an initial matter, the Court notes that the plain language of Section 1818(i)(1) indicates that the phrase "affect by injunction or otherwise" in the Jurisdiction–Divesting Clause can not have a literal meaning. A literal reading of the Jurisdiction–Divesting Clause would prevent a district court from issuing an injunction to *enforce* a cease-and-desist order, which would have the absurd result of negating the phrase "require compliance" in the Jurisdiction–Granting Clause. Rather, the "jurisdictional bar of § 1818(i)(1) must ... be read in the context of the entire statute." *See In re JPMorgan Chase Mortg. Modification Litig.,* 880 F.Supp.2d 220, 231 (D.Mass.2012).

**6.** 12 U.S.C. 1818(i)(1) provides in full: "The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831o or 1831p–1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 1831o or 1831p–1 of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. 1818(i)(1).

Section 1818(i)(1)—the one at issue here—is but one of three parts of Section 1818 that "establish[ ] a tripartite regime of judicial review" for cease-and-desist orders issued by certain federal banking agencies pursuant to the authority granted to them in Section 1818(b). *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 38, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (discussing 12 U.S.C. §§ 1818(c)(2), (h)(2), and (i)(1)). The other two subsections are Sections 1818(c)(2) and (h)(2). Section 1818(c)(2) provides that the *recipient* of a cease-and-desist order "may seek an injunction in district court restraining enforcement of the order." *Id.* Section 1818(h)(2) "authorizes court of appeals review of final [federal banking agency] orders." *Id.* In short, the Section 1818 "tripartite regime" focus on the judicial mechanisms by which either the *federal banking agency* or *recipient* of a cease-and-desist order may obtain review of such an order.

 "It is significant that there is no provision in [Section 1818] for a non-party to a consent order to challenge findings made pursuant to the Order." *In re JPMorgan Chase*, 880 F.Supp.2d at 232. "It follows that the jurisdictional bar is not meant to displace a non-party's right to present its claims to a federal court, or the jurisdiction of the court to hear those claims." *Id.*

 Understood in this context, it is clear that the Jurisdiction–Divesting Clause was "not intend[ed] to ... prohibit non-parties from exercising their separate

remedies at law." *Id.* at 231. Rather, "the primary purpose of [Section 1818] is to prevent federal courts from usurping the OCC's power to enforce its own consent orders *against parties to the orders.*" *Id.* at 231; *see also Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1039 (D.C.Cir. 1998) ("To prevent regulated parties from interfering with the comprehensive powers of the federal banking regulatory agencies, Congress severely limited the jurisdiction of courts to review ongoing administrative proceedings brought by banking agencies.").

ii. **Section 1818(i)(1) does not divest this Court of jurisdiction because the 2011 Consent Order is silent regarding the relief Plaintiffs seek in this case**

Defendants appears to argue that Section 1818(i)(1) divests a federal court of jurisdiction over a case brought by a non-party to a federal banking agency's consent order where, as here, the consent order requires a defendant to create a *plan* to redress unsound and unsafe practices and this plan may or may not in the future provide the same relief sought by the non-party in its case.[7] This Court disagrees because: (1) the 2011 Consent Order is silent regarding the relief Plaintiffs seek in this case; (2) the only published opinion to squarely address this issue rejected the same jurisdictional argument advanced by the same Defendant regarding the same 2011 Consent Order; and (3) Defendants' cases are distinguishable.

---

7. Defendants' theory about the scope of Section 1818(i)(1) is somewhat unclear. *See* Mot. at 15 (stating that Section 1818(i)(1) divests this Court of jurisdiction because "Plaintiffs' claims and requested relief are subsumed by the Consent Order so as to 'affect' the administration of, compliance with, or enforcement of that Order"); *id.* at 13:4–5 (no jurisdiction where the complaint "asks a court for relief

that seeks to double-down on and compete with an OCC Consent Order"); *id.* at 14:3–4 (no jurisdiction where complaint is "seeking relief that overlaps with the relief provided in the Consent Order"); *id.* at 14:20–21 (no jurisdiction where complaint requires parties to "undertake actions that were already subsumed by existing OCC consent orders").

#### 1. The 2011 Consent Order is silent regarding the relief Plaintiffs seek in this case

Defendant contends that the "OCC already raised and redressed the same alleged conduct" as in the FAC. Mot. at 15–16. Defendants provides a helpful chart, which attempts to show that the injunctive and monetary relief sought in the FAC overlaps with either: (1) the 2011 Consent Order's requirement that Chase "implement" a "plan" to address its certain practices regarding certain borrowers; or (2) the 2012 Framework [8] that the OCC provided to Defendant Chase NA's independent consultants which contain "examples" to be "use[d] . . . to recommend remediation" to certain borrowers.

This Court provides a similar chart here, although the Court includes crucial equivocal language regarding the 2011 Consent Order and the 2012 Framework. The Court notes that the 2011 Consent Order defines "loss mitigation activities" to "include . . . short sales." Defs.' RJN (Dkt. 16) Ex. A at Art. III § (2).

| Relief | FAC seeks the following relief. . . | 2011 Consent Order requires. . . |
| --- | --- | --- |
| Injunction prohibiting language | An injunction prohibiting Defendants from sending "false," "confusing, contradictory and erroneous," "unconscionable," or "deceptive[ ]" communications to borrowers in connection with short sales. FAC ¶¶ 58, 73(a)-(d), 74(c), 75(c), 78; id. at 38 (Prayer for Relief ¶¶ 7, 10). This is one of several forms of relief Plaintiffs seek for their Seventh and Eighth Claims. | Defendant Chase NA "shall submit to" the OCC, and, "upon adoption" by the OCC, "implement" [9] the following:<br><br>● "Compliance Program," which "shall" include "processes to ensure that. . . compliance programs have the requisite authority. . . so that. . . deficiencies" in Defendant Chase NA's Loss Mitigation activities are "identified and promptly remedied." Defs.' RJN (Dkt. 16) Ex. A at Art. IV, §§ (1), (1)(o ).<br>● "plan for operation of its management information system. . . to ensure the timely delivery of complete and accurate information" regarding "Loss Mitigation activities." Id. at Art. VIII.<br>● "plan. . . for ensuring effective coordination of communications with borrowers. . . related to Loss Mitigation. . . and foreclosure activities." Id. at Art. IX, § (1). |

**8.** The Court is referring to the "June 21, 2012 Financial Remediation Framework." Defs.' RJN (Dkt. 16) Ex. G.

**9.** Defs.' RJN (Dkt. 16) Ex. A at Art. XI, § (1).

| Monetary Relief | "[M]oney or property" received from Plaintiffs by Defendants due to "false[ ] and deceptive[ ] represent[ations]" about their post-short sale deficiency. FAC ¶ 76. | Defendant Chase NA "shall submit to" the OCC, and, "upon adoption" by the OCC, "implement" [10] a "plan" to "reimburs[e] or otherwise appropriately remediat[e] borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury." Defs.' RJN (Dkt. 16) Ex. A at Art. VII, § (5)(a). |
|---|---|---|
| Relief | FAC seeks the following relief. . . | 2012 Framework states that. . . |
| Injunction requiring action | An order requiring:<br><br>• Defendants to "contact all major credit reporting agencies and notify them that the claimed 'deficiency balances'. . . are fully discharged debts as of the date allegedly incurred." FAC (Prayer for Relief ¶¶ 7, 10)<br>• "recovery of economic damages sustained. . . as a result of damage to [Plaintiffs'] credit rating." FAC (Prayer for Relief ¶¶ 3–6). | • "independent consultants" for the "mortgage servicers" that entered into the 2011 Consent Order "will use the Framework to recommend remediation" and the mortgage "servicers will prepare remediation plans based on [those] recommendations." Defs.' RJN (Dkt. 16) Ex. G at 1.<br>• the 2012 Framework "provides examples of where compensation or other remediation is required for financial injury" that these independent consultants "will use." *Id.*<br><br>• One such example is that a servicer "[s]uspend foreclosure where appropriate, correct servicer record for amounts in error and/or reimburse borrower for amounts paid in error, plus interest; and where required, correct credit reports and pay $500 for credit reporting error." *Id.* at 5 (text at column "No. 13"). This example appears under the heading "FORECLOSURE IN PROCESS" and describes the "[s]ervicer error" as one "that did not directly cause foreclosure, but did directly result in financial injury to borrower." *Id.* |

Regarding the 2011 Consent Order, the Court concludes that:

• The FAC's request for an *injunction prohibiting* Defendants from making certain communications regarding short sales neither "affect[s] by injunction or otherwise" nor "modif[ies]" the 2011 Consent Order's requirement that Defendant develop a *plan* to ensure accurate communication about short sales. *See* 12 U.S.C. § 1818(i)(1).

10. Defs.' RJN (Dkt. 16) Ex. A at Art. XI, § (1).

• Similarly, the FAC's request for *money or property* due to deceptive representations about Defendants' short sales neither affects nor modifies the 2011 Consent Order's requirement that Defendant develop a *plan* to reimburse borrowers for financial injury.

Defendants' reliance on the 2011 Consent Order's requirement that Defendants develop a plan is misplaced for two reasons. First, because the 2011 Consent Decree only requires Defendant to craft a *plan* and implement it, the 2011 Consent Decree does not provide the *specific relief* the FAC seeks—injunctive and monetary relief—nor does it command that these *specific Plaintiffs* will obtain such relief. Second, Defendants have cited no authority that any plan approved by the OCC constitutes an "order" for purposes of Section 1818(i)(1). Even assuming that such a plan constitutes part of the 2011 Consent Order, Defendant has not provided this Court with the any such plan. Thus, the Court is left only with the ethereal possibility that Defendants' plan *might* provide all the relief Plaintiffs seek here. Then again, the plan might not. Indeed, given that Defendants contend in the rest of their Motion that Plaintiffs' claims fail on the merits, the Court would be surprised to learn that Defendants' plan provides exactly the relief that Plaintiffs seek here.

Similarly, regarding the 2012 Framework, the Court concludes that:

• The FAC's request for an *injunction mandating* that Defendants make certain communications to credit agencies neither affects nor modifies the 2012 Framework's *recommendation* that Defendants "correct credit reports." *See* Defs.' RJN (Dkt. 16) Ex. G at 5.

• The FAC's request that Defendants pay Plaintiffs damages due to borrowers' lowered credit rating neither affects nor modifies the 2012 Framework's *recommendation* that Defendants "pay $500 for credit reporting error." *See id.*

First, Plaintiffs do not seek a recommendation from a federal banking agency; Plaintiffs seek the concrete remedy of an injunction and monetary payments. Furthermore, Defendants have cited no authority that any OCC recommendation contained in the 2012 Framework constitutes part of an "order" for purposes of Section 1818(i)(1). Finally, even assuming that such an OCC recommendation constitutes part of the 2011 Consent Order, Defendant has not shown that this recommendation provides the *specific relief* the FAC seeks—injunctive and monetary relief—nor applies to these *specific Plaintiffs*, nor that the $500 recommended by the OCC is the maximum that these Plaintiffs could attain.

In sum, Section 1818(i)(1) does not divest this court of jurisdiction because Defendants have not provided the legal authority or evidence to show that the relief in the FAC "affect[s] by injunction or otherwise" or "modif[ies]" the 2011 Consent Order. *See* 12 U.S.C. § 1818(i)(1).

**2. The only published opinion to squarely address this issue rejected the same jurisdictional argument advanced by the same Defendant regarding the same 2011 Consent Order**

This Court's conclusion is supported by the only published opinion to address the *same* jurisdictional argument advanced by the *same* Defendant [11] based on the *same* 2011 Consent Order.[12] *See In re JPMor-*

---

11. JPMorgan Chase Bank, NA, is a Defendant in both *In re JPMorgan Chase* and the present case, although the present case includes addi-

tional Defendants. *See In re JPMorgan Chase,* 880 F.Supp.2d at 225–26.

12. The Court concludes that the 2011 Consent

*gan Chase Mortg. Modification Litig.*, 880 F.Supp.2d 220, 232–33 (D.Mass.2012).

In *In re JPMorgan Chase,* the court held that Section 1818(i)(1) did not divest that court of jurisdiction. *Id.* at 231–33. The plaintiff-homeowners brought suits against Defendant Chase NA under four of the same causes of action brought in this case and based on similar factual allegations as in the present case, namely:

 (1) **breach of contract,** alleging Defendant Chase "breached" their mortgage modification agreements by "continuing to treat the homeowner's account as if no modification had occurred" [13];

 (2) **promissory estoppel,** alleging Defendant Chase "deceived, strung along, and misled" the plaintiffs by "false and misleading promises to homeowners about the prospects of a mortgage modification" [14];

 (3) **California's Rosenthal Fair Debt Collection Practices Act** ("Rosenthal claim"), Cal. Civ.Code § 1788 *et seq.*, alleging Defendant Chase was

"using false, deceptive, and misleading statements and omissions in connection with the collection of their mortgage loan debts" [15];

 (4) a derivative claim under the **California's Unfair Competition Law.**[16]

In *In re JPMorgan Chase,* Defendant Chase NA argued that Section 1818(i)(1) divested the court of jurisdiction because ruling on the plaintiffs' claims for breach of contract and other state consumer protection law violations would "affect" the "enforcement of an OCC consent order" within the meaning of Section 1818(i)(1). *Id.* at 231.

The court rejected Defendant's argument, reasoning that Section 1818(i)(1) "is not meant to displace a non-party's right to present its claims to a federal court" because the 2011 Consent Order is "abundantly clear" that the Order itself and the plan it requires banks to create and implement do "not establish an exclusive remedy for plaintiffs' financial injuries." *Id.* at 233. In addition, the court noted that its holding was consistent with "the OCC's

Order in the present case is the same one discussed by the court in *In re JPMorgan Chase* because the latter quotes language from a consent order entered into by Defendant on the same date as the 2011 Consent Order and the quotations and pages match those of the 2011 Consent Order. *Compare In re JPMorgan Chase,* 880 F.Supp.2d at 228–31, 229 n. 11 (describing consent order entered into by Defendant in "April of 2011" and quoting page 3 as finding that Defendant Chase NA "failed to devote sufficient financial, staffing, and managerial resources to ensure proper administration of its foreclosure processes; [and had] failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training") *with* Defs.' RJN (Dkt. 16) Ex. A at 3 (containing identical language).

**13.** *See In re JPMorgan Chase,* 880 F.Supp.2d at 225–26, 231–32. Similarly, Plaintiffs here

bring a breach of contract claim because Defendants allegedly contracted for a mortgage modification—releasing Plaintiffs of the short sale deficiency—but then treated Plaintiffs' account as if no modification had occurred.

**14.** *See In re JPMorgan Chase,* 880 F.Supp.2d at 225–26. Similarly, Plaintiffs here brings a promissory estoppel claim because Defendants allegedly made false and misleading promises to Plaintiffs about whether they would continue to owe Defendants for any deficiency after a short sale.

**15.** *See In re JPMorgan Chase,* 880 F.Supp.2d at 241–42. Similarly, Plaintiffs here brings a Rosenthal claim because Defendants allegedly made false and misleading statements to creditors that Plaintiffs continued to owe money on their mortgage after the short sale.

**16.** *See In re JPMorgan Chase,* 880 F.Supp.2d at 235 n. 28. Similarly, Plaintiffs here brings a derivative UCL claim.

own FAQ publication," which "assures borrowers that participation" in the "OCC-approved ... plan" required by the 2011 Consent Order "does not result in a waiver of their right to pursue legal remedies." *Id.* at 233, 229–31, 230 n. 13 (summarizing OCC's FAQ publication and the plan Defendant Chase NA developed in response to the 2011 Consent Order).

Thus, regarding the breach of contract claim, the court held that Section "1818 does not preclude the court from acting to remedy the breach as the result would not be inconsistent with the Consent Order." *Id.* at 232. Similarly, regarding the "state consumer protection act claims, the [Consent] Order is clear that its enforcement is not affected by compliance with state laws—indeed, the Order requires Chase to comply with all applicable federal and state laws." *Id.* Finally, the Court concluded that, at most, any recovery plaintiffs obtained through the plan mandated by the 2011 Consent Order would prohibit plaintiffs from "obtaining a duplicative recovery, an issue that will not arise until the claims here are finally adjudicated and any off-set can be calculated." *Id.*

In short, *In re JPMorgan Chase* held that Section 1818(i)(1) does not divest the court of jurisdiction because adjudication of the plaintiffs' claims would not affect the 2011 Consent Order's requirement that Defendant Chase NA develop a plan. *Id.* Given that *In re JPMorgan Chase* involved the substantially similar acts as those allegedly done by Defendants here, four of the same causes of action as those at issue here, and the same 2011 Consent Order at issue here, this Court finds *In re JPMorgan Chase* to be indistinguishable. Furthermore, this Court is highly persuaded by *In re JPMorgan Chase* given that it is a published opinion replete with cogent reasoning and numerous citations to authority.

### 3. Defendants' jurisdictional argument is contrary to the legislative history of Section 1818(i)

Furthermore, Defendants' argument is contrary to the legislative history of Section 1818(i). In 1989, Congress gave Section 1818(i) greater teeth as part of several reforms to "aggressively respond[ ] to the public perception ... that financial institutions ... were playing fast and loose with the law and the public purse, courtesy of deposit insurance." John J. Byrne et. al., *Examining the Increase in Federal Regulatory Requirements and Penalties: Is Banking Facing Another Troubled Decade?*, 24 Cap. U.L.Rev. 1, 2 (1995) (citing Section 1818(i) as part of a "new regime" where "more individuals are subject to civil money penalties," "the penalties are significantly larger," and "the kinds of activities which may give rise to a [penalty] have been expanded."). These reforms reflected the philosophy that "a terrified banker was going to be a better banker." *Id.*

Defendants' interpretation of Section 1818(i) would require this Court to read a regulatory statute designed to strike fear in the hearts of the banking industry as actually creating a jurisdictional mechanism by which banks can escape millions of dollars of liability in consumer class actions. Essentially, Defendants' rule allows any defendant-bank to insulate itself from liability for practices that violate state contract and consumer laws simply by entering into an OCC consent order which requires the defendant-bank to develop a plan. Under Defendants' rule, the defendant-bank could then use its promise to make a plan to divest courts of jurisdiction over numerous consumer lawsuits, *even if the defendant-bank* implements a plan that *denies the very relief that plaintiffs seek in those lawsuits.* Defendants' interpretation is, frankly, absurd because the pur-

pose of the statutory regulatory scheme here is to *protect* consumers, not to stymie their efforts to obtain redress.

In sum, the Court refuses to read a regulatory statute designed to curb bad banking practices as providing those very banks with a jurisdictional mechanism to avoid liability.

#### 4. Defendants' cases are distinguishable

All of Defendants' published cases holding that Section 1818(i)(1) divested a court of jurisdiction are distinguishable because in these cases the relief sought was either: (1) *expressly banned* by a federal banking agency's order [17]; (2) an injunction to stop the issuance or enforcement of a federal banking agency's order [18]; or (3) declaratory relief to have a federal bankruptcy agency's order declared invalid.[19] *See* Mot 13–15 (citing cases). In contrast, Plaintiff here does not seek relief expressly banned by the 2011 Consent Order, nor an injunction to prevent its enforcement, nor declar-

atory relief to have the 2011 Consent Order declared invalid.

Indeed, the court in *In re JPMorgan Chase* distinguished several of these cases on similar grounds in rejected the same jurisdictional argument advanced by the same Defendant here. *See* 880 F.Supp.2d at 232–33 (distinguishing *American Fair Credit Association*); *id.* at 232 n. 16 (distinguishing *MCorp Financial*); *id.* at 233 n. 18 (distinguishing *Henry*).

Defendants also rely on *Bakenie v. JPMorgan Chase Bank, N.A.*, in which a court in this district accepted a similar jurisdictional argument advanced by the same Defendant Chase NA about the same 2011 Consent Order. *See* SACV 12–60 JVS MLGX, 2012 WL 4125890 (C.D.Cal. Aug. 6, 2012) (J. Selna). In *Bakenie*, the court held that Section 1818(i)(1) divested the court of jurisdiction because Plaintiffs' UCL claim would "affect ... enforcement of" the 2011 Consent Order. *Id.* at *3. The plaintiffs' UCL claim was "based on

---

**17.** *See United States v. Spiegel*, 995 F.2d 138, 139–41 (9th Cir.1993) (holding that Section 1818(i)(1) divested court of jurisdiction to rule on criminal defendant's request to unfreeze his assets because relief sought would "modify the [federal banking agency's] restraining order," which had frozen defendant's assets); *Am. Fair Credit Ass'n v. United Credit Nat'l Bank*, 132 F.Supp.2d 1304, 1312 (D.Colo. 2001) (holding that Section 1818(i)(1) divested court of jurisdiction to rule on a breach of contract claim brought by plaintiff, a non-party to an OCC consent order, against a parent company that was a party to the OCC consent order where plaintiff requested that parent company "pay money damages" to plaintiff because relief sought was "in direct contravention of the" consent order, which required parent to pay only its subsidiary).

**18.** *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 34, 44, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (holding that Section 1818(i)(1) divested court of jurisdiction to rule on bankruptcy debtor's adversary proceeding seeking "to enjoin the prosecution of two pending administrative proceedings" because injunctive relief sought

would "affect by injunction ... the issuance or enforcement of any [federal banking agency's] notice or order").

**19.** *See Groos Nat. Bank v. Comptroller of Currency*, 573 F.2d 889, 894–95 (5th Cir.1978) (holding that Section 1818(i)(1) divested court of jurisdiction to rule on plaintiff's "action for declaratory judgment" seeking "a determination that the [OCC's prior] agreement [with plaintiff] was invalid and that no enforcement should proceed on the basis of that agreement" because relief sought would " 'otherwise' affect the 'issuance or enforcement of any notice or order' "); *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 510, 513 (10th Cir.1994) (holding that Section 1818(i)(1) divested court of jurisdiction to rule on plaintiff's action seeking "declaratory and injunctive relief" to rescind federal banking agency's cease-and-desist order to which plaintiff had consented and to "enjoin [federal banking agency] from taking any action" against plaintiff because relief sought would be "tantamount to setting aside the [federal banking agency's] consent orders").

Defendants' improper notarial practices," namely "various foreclosure documents were acknowledged by non-notaries, outside the presence of the signers, without verification of the signer's identification, and without proper recordation in a sequential journal." *Id.* The court provided little reasoning for its conclusion other than the observation that Section 1818(i)(1) is intended to be "far-reaching." *Id.* The court neither mentioned nor distinguished *In re JPMorgan Chase.*

This Court declines to follow *Bakenie* and instead follows *In re JPMorgan Chase.*[20] *In re JPMorgan Chase* is a published, lengthy opinion replete with cogent reasoning and citations to numerous authorities and was issued in a multi-district litigation case in which the plaintiff-borrowers were represented by counsel. In contrast, *Bakenie* is an unpublished, four-page opinion in a case where four of the five plaintiff-homeowners were pro se. The grim reality of our adversarial system that sometimes the party that fails to make an argument loses, even if the law and evidence is on its side. Thus, given the absence of reasoning and brevity of *Bakenie,* combined with its plaintiffs' pro se status, the Court suspects that the outcome of *Bakenie* was dictated more by the absence of plaintiffs' argument than the language of and authority surrounding Section 1818(i)(1).[21]

Thus, this Court finds the cases cited by Defendants to be either distinguishable or unpersuasive.

**20.** Alternatively, this Court distinguishes *Bakenie* on the grounds that the facts undergirding Plaintiffs claim here differ from those in *Bakenie.*

**21.** The Court similarly declines to follow a slip opinion dismissing an adversarial proceeding in bankruptcy that seems to rule on a

### 5. Conclusion

In sum, the Court holds that Section 1818(i)(1) does not divest a federal court of jurisdiction over a case brought by a non-party to a federal banking agency's consent order where, as here, the consent order requires a defendant to create a *plan* to redress certain practices and this plan may or may not provide the same relief sought in the case brought by the non-party to the consent order. Thus, the Court DENIES Defendants' Motion to the extent it seeks dismissal based on 12 U.S.C. § 1818(i)(1) divesting this Court of jurisdiction.

### b. The primary jurisdiction and equitable abstention doctrines are inapplicable

Defendants alternatively argue that this Court should decline to exercise jurisdiction under either the primary jurisdiction doctrine or deny relief under the equitable abstention doctrine. The Court declines to do so.

### i. Primary jurisdiction doctrine

The primary jurisdiction doctrine is a "prudential doctrine" under which courts "may" decide that "the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *Davel Communications, Inc. v. Qwest Corp.,* 460 F.3d 1075, 1086–87 (9th Cir.2006). Whether to invoke the primary jurisdiction doctrine is "committed to the sound discretion of the court." *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.,* 307 F.3d 775, 781 (9th Cir.2002).

similar jurisdictional issue because the opinion was issued due to non-opposition to the motion. *See* Pl. Objections (Dkt. 24) at 3–4; Defs. Notice of Supp. Authority (Dkt. 23) Ex. A (Order Granting Motion to Dismiss, Dkt. 23 in *In Re Owner Management Service v. JP Morgan Chase et al.,* Adv. Case. No. 1:12–ap–01222–MT).

■ Courts may exercise their discretion to invoke the primary jurisdiction doctrine where "four factors" exist, namely: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Davel,* 460 F.3d at 1086–87.

■ Defendants appear to address only the third factor by invoking a statute which provides that "[a]ny national banking association may make ... loans ... on interests in real estate, subject to section 1828(*o* ) of this title and such restrictions and requirements as the [OCC] may prescribe by regulation or order." *See* 12 U.S.C. § 371(a); Mot. at 18. Section 1828(*o* ) provides for the creation of "uniform regulations prescribing standards for extensions of credit that are ... secured by liens on interests in real estate." *See* 12 U.S.C. § 1828(*o* )(1)(a).

The Court fails to see what "issue" in this case "has been placed by Congress within the jurisdiction" of the OCC, much less why the resolution of any such issue requires the OCC's "expertise or uniformity in administration." *See Davel,* 460 F.3d at 1086–87. The FAC brings exclusively state law claims, such as breach of contract and UCL violations, for which the OCC has no special administrative jurisdiction or expertise. Rather, both the OCC itself and California courts have recognized that a "number of state laws," such as California's UCL, "prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions." *See Smith v. Wells Fargo Bank,*

*N.A.,* 135 Cal.App.4th 1463, 1479, 38 Cal. Rptr.3d 653 (2005).

Furthermore, as Plaintiffs note, Plaintiffs' CCRAA claim is expressly exempted from federal preemption.[22] Given Congress's express exemption of a CCRAA claim, the Court is baffled as to how this state law claim could raise an issue that has been placed by Congress within the jurisdiction and expertise of the OCC.

Thus, the Court declines to invoke the primary jurisdiction doctrine.

### ii. Equitable abstention doctrine

■ Under the equitable abstention doctrine, a court has the discretion to refrain from awarding relief for a UCL claim in the rare instance where: (1) such relief would "interfere with" a government agency's "administration of" its regulations to such an extent that the court "risk[s] throwing the entire complex economic arrangement out of balance"; and (2) the "public's need for" the relief "is not so great as to warrant judicial interference in the administrative scheme designed to address those needs." *Shamsian v. Department of Conservation,* 136 Cal.App.4th 621, 643, 39 Cal.Rptr.3d 62 (2006). The "underlying rationale" of the equitable abstention doctrine is that, "because the remedies available under the UCL ... are equitable in nature, courts have the discretion to abstain from employing them." *Desert Healthcare Dist. v. PacifiCare FHP, Inc.,* 94 Cal.App.4th 781, 795, 114 Cal.Rptr.2d 623 (2001).

■ It is an abuse of discretion to use the equitable abstention doctrine to deny relief where plaintiffs' claims require the court "to perform the basic judicial functions of contractual and statutory in-

---

**22.** *See* 15 U.S.C. § 1681t(b)(1)(F)(ii) (providing "except[ion]" to preemption under 15 U.S.C. § 1681t(b)(1)(F) "with respect to section 1785.25(a) of the California Civil Code

(as in effect on September 30, 1996)"); *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1172–73 (9th Cir.2009).

terpretation," even where a government agency offers an "administrative process by which" plaintiffs can seek relief. *Arce v. Kaiser Foundation Health Plan, Inc.*, 181 Cal.App.4th 471, 500, 502, 104 Cal. Rptr.3d 545 (2010). "[T]he fact that an administrative agency may, at some future time, [act in a manner] bearing on pending legal issues does not mean that a court should abstain from adjudicating a presently justiciable controversy." *Id.* at 502, 104 Cal.Rptr.3d 545.

In *Arce*, the court reversed the lower court's dismissal of a UCL claim under the equitable abstention doctrine where the defendant allegedly breached its contracts and violated certain California statutes requiring parity in medical treatment, even though a government agency offered an "administrative process by which" the putative class could seek relief. *Arce v. Kaiser Foundation Health Plan, Inc.*, 181 Cal. App.4th 471, 499–503, 104 Cal.Rptr.3d 545 (2010). The court reasoned that equitable abstention was inappropriate because resolution of the breach of contract claims merely required the lower court to "interpret the relevant terms of the contract" and decide whether the defendant's acts were authorized by the contract. *Id.* at 500, 104 Cal.Rptr.3d 545. Similarly, resolution of the statutory claims merely required the lower court to "interpret the relevant provisions of the" statutes and decide whether these statutes required defendant to act. *Id.* at 500, 104 Cal.Rptr.3d 545. Finally, the court rejected the defendant's argument that abstention was warranted due to the availability an "administrative process by which" the putative class could seek relief because the prospect of the agency acting "at a future time" in a manner "bearing on pending legal issues does not mean that a court should abstain from adjudicating a presently justiciable controversy." *Id.* at 502, 104 Cal.Rptr.3d 545.

As in *Arce*, Plaintiffs' putative class action brings a UCL claim and alleges that Defendants breached their contracts and violated certain California statutes, and Defendants respond by invoking the equitable abstention doctrine. As in *Arce*, resolution of Plaintiffs' claims merely require this Court to "interpret the relevant terms of the contract" and "interpret the relevant provisions of the" statutes. *Id.* at 500, 104 Cal.Rptr.3d 545. Like in *Arce*, Defendants contend that there is an "administrative process by which" the putative class may be able to seek relief, namely, the plan which Defendants are required to create pursuant to the 2011 Consent Order. *See id.* at 502, 104 Cal. Rptr.3d 545. However, as in *Arce*, this Court rejects Defendants' argument because the fact that the OCC or some plan it adopts "may, at some future time," require Defendants to provide the relief that Plaintiffs seek here "does not mean that a court should abstain from adjudicating a presently justiciable controversy." *Id.* at 502, 104 Cal.Rptr.3d 545.

Finally, this Court is nonplussed that a multi-billion-dollar corporation would invoke an *equitable* doctrine against borrowers who have lost their homes so as to avoid liability for allegedly imposing illegal contracts on these borrowers and engaging in unfair debt collection practices. Defendant is a corporation with enough resources to have survived the recent recession, which is the largest economic downturn since the Great Depression. Plaintiffs are individuals who could not afford to make their mortgage payments and so were forced to sell their home in a short sale. The Court fails to see how the equities of the situation dictate denying Plaintiffs relief.

Thus, this Court holds that equitable abstention is inappropriate and that Plaintiffs "are entitled to a timely determination

of their rights." *Id.* at 503, 104 Cal. Rptr.3d 545; *see also Matoff v. Brinker Restaurant Corp.*, 439 F.Supp.2d 1035, 1038 (C.D.Cal.2006) (declining to exercise "equitable abstention" over UCL claim because defendant did not show a "complex administrative scheme governing" the relief sought "or indicate[ ] how [this scheme] might be upset by an order of restitution").

### iii. Conclusion

In sum, the Court refuses to exercise its discretion to decline jurisdiction under the primary jurisdiction doctrine or deny relief under the equitable abstention doctrine. Thus, the Court DENIES Defendants' Motion to the extent it seeks dismissal based on the primary jurisdiction or equitable abstention doctrines.

### c. Section 580b applies to short sales

This case raises an issue of first impression,[23] namely, whether California Civil Procedure Code Section 580b applies to

bar Defendants, which are mortgage lenders, from collecting a deficiency where Plaintiffs sold their home after defaulting on their mortgage[24] and with the consent of Defendants in a transaction commonly referred to as a "short sale."

The parties dispute whether California Civil Procedure Code Section 580b applies to short sales. The Court first provides the text, legislative history, and purpose of Section 580b and then turns to Defendants' arguments.

### 1. Text, legislative history, and purpose of Section 580b

 Under California law, a "creditor must rely upon his security before enforcing the debt," and "[i]f the security is insufficient, his right to a judgment against the debtor for the deficiency may be limited or barred by sections ... 580b, [and other sections] ... of the Code of Civil Procedure." *Roseleaf Corp. v. Chierighi-*

---

**23.** The lack of authority on whether Section 580b applies to short sales may be due to short sales' relative rarity prior to the recent housing crisis, given that "home buyers and real estate agents, ... once avoided short sales because of the stigma associated with longer escrows and high fallout rates." *See* Brian Bean & Tim Hardin, California short sales increase to highest level in 3 years, The Press–Enterprise (March 9, 2012 12:36 PM) ("Short sales continued to soar in January, reaching their highest level in California in three years.") http://www.pe.com/real-estate/company-news/20120309-california-short-sales-increase-to-highest-level-in-3-years.ece; *see also* Dan Levy, U.S. Foreclosure Filings Fall 4% as Lenders Increase Short Sales, Bloomberg.com (June 14, 2012, 4:01 PM) ("Foreclosure filings in the U.S. fell 4 percent in May from a year earlier as lenders disposed of more properties through short sales, where the price is less than the amount owed.") http://www.bloomberg.com/news/2012–06–14/u-s-foreclosure-filings-fall-4-as-lenders-increase-short-sales.html; 2 The Law of Real Estate Financing § 12:10, Short sales ("The subprime mortgage crisis of 2008 and attend-

ant decline in property values ignited a new entry to the mortgagee options upon default— the so-called short sale.").

**24.** The Court infers that Plaintiffs were in default because they allege that Defendant Chase LLC conditioned the short sale on Plaintiffs being "30 days late on their mortgage payments" and, given that the short sale was consummated, it can be inferred that Plaintiffs met this condition. *See* FAC ¶¶ 8 ("[Plaintiffs] were informed by Chase [LLC] that before [it] would approve any short sale, it would be necessary that Plaintiffs be at least thirty days late on their mortgage payments."), 9 ("Chase [LLC] agreed to accept this short sale" and "documented the acceptance of the short sale in a letter to [Plaintiffs on] December 10, 2009" in which Defendant Chase LLC "confirmed its agreement to 'release its security interest(s) in the ... property upon receipt of $3,000 ....' "), 26(b) ("This delinquency originally appeared because Plaintiff was ... informed by Chase [LLC] that she needed to be thirty days late on payment before the 'short sale' could commence.").

*no,* 59 Cal.2d 35, 38, 27 Cal.Rptr. 873, 378 P.2d 97 (1963).

██ Section 580b and other sections barring collection of deficiencies are commonly referred to as "antideficiency statutes." *Bank of Am. v. Graves,* 51 Cal. App.4th 607, 611, 59 Cal.Rptr.2d 288 (1996). These anti-deficiency statutes are "construed liberally to effectuate the legislative purposes underlying them." *Id.* at 611 n. 3, 59 Cal.Rptr.2d 288.

### a. Text

California Civil Procedure Code § 580b is titled "Purchase money mortgages, etc.; no deficiency judgment." Section 580b provides in relevant part that: *"No deficiency judgment shall lie* in any event after *a sale* of real property for failure of the purchaser to complete his contract of sale . . . *under* a deed of trust or *mortgage* on a dwelling . . . given to a lender *to secure repayment of a loan* which was in fact *used to pay all or part of the purchase price* of that dwelling." Cal.Civ.Proc.Code § 580b (emphasis added).[25]

### b. Legislative history

██ The California legislature enacted Section 580b to "counteract" a common phenomena "during the great depression" whereby a "mortgagee was able to purchase the subject real property at the foreclosure sale at a depressed price far below its normal fair market value and thereafter

to obtain a double recovery by holding the debtor for a large deficiency." *Cornelison v. Kornbluth,* 15 Cal.3d 590, 600, 125 Cal. Rptr. 557, 542 P.2d 981 (1975); *see also* Cal. Stat. c. 642, § 5 (1933).

Section 580b was amended in 1963 to add, among other things, a clause extending Section 580b to the kind of real property at issue in this case, namely, a "dwelling for not more than four families . . . occupied, entirely or in part, by the purchaser." *See Barash v. Wood,* 3 Cal.App.3d 248, 251, 83 Cal.Rptr. 153 (1969); Cal. Stat. c. 2158, § 1 (1963).

### c. Purpose

In interpreting Section 580b, the California Supreme Court and lower courts have consistently rejected any interpretations that undermine the purpose of the statute. *See e.g., DeBerard Properties v. Lim,* 20 Cal.4th 659, 663, 85 Cal.Rptr.2d 292, 976 P.2d 843 (1999) (rejecting interpretation that would allow creditor to "circumvent" Section 580b and thus "flout" its "purpose").

██ The California legislature passed Section 580b for "two reasons": (1) to "stabilize[ ] purchase money secured land sales [prices] by [preventing] overvaluing the property"; and (2) ensure "purchasers as a class are harmed less than they might otherwise be during a time of economic decline" because "if property values drop

25. California Civil Procedure Code § 580b provides that:

"No deficiency judgment shall lie in any event after a sale of real property or an estate for years therein for failure of the purchaser to complete his or her contract of sale, or under a deed of trust or mortgage given to the vendor to secure payment of the balance of the purchase price of that real property or estate for years therein, or under a deed of trust or mortgage on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or

part of the purchase price of that dwelling occupied, entirely or in part, by the purchaser.
Where both a chattel mortgage and a deed of trust or mortgage have been given to secure payment of the balance of the combined purchase price of both real and personal property, no deficiency judgment shall lie at any time under any one thereof if no deficiency judgment would lie under the deed of trust or mortgage on the real property or estate for years therein."
Cal.Civ.Proc.Code § 580b.

..., the purchaser's loss is limited to the land that he or she used as security in the transaction." *DeBerard Properties v. Lim,* 20 Cal.4th 659, 663, 85 Cal.Rptr.2d 292, 976 P.2d 843 (1999).

These two public policy goals are achieved by shifting the risk of falling property prices to the lender. As the California Supreme Court explained:

Section 580b places the risk of inadequate security on the purchase money mortgagee. [Such mortgagee] is thus discouraged from overvaluing the security. Precarious land promotion schemes are discouraged, for the security value of the land gives purchasers a clue as to its true market value.... If inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability. Section 580b thus serves as a stabilizing factor in land sales.

*DeBerard Properties v. Lim,* 20 Cal.4th 659, 663–64, 85 Cal.Rptr.2d 292, 976 P.2d 843 (1999).

**2. Section 580b applies to short sales, as shown by its plain language and purpose, as well as its relationship to other anti-deficiency statutes 580d and 580e**

Defendants contend that Section 580b applies only to foreclosure sales or, alternatively, at least does not apply to short sales. Reply at 5:3–4.

■ This Court rejects Defendants arguments and instead concludes that Section 580b applies regardless of the mode of sale. First, the Court defines short sales and foreclosures sales and summarizes some motivations for entering into each one. Next, the Court rejects Defendants' interpretation because it: (1) is contrary to Section 580b's plain language; (2) undermines Section 580b's purpose of land price stabilization; and (3) is not supported by either the plain language or legislative history of another anti-deficiency statute, Section 580e, that Defendants invoke to argue that Plaintiffs' interpretation of 580b would render 580e superfluous.

**a. Difference between a short sale versus a foreclosure sale**

■ The primary difference between the two modes of sale discussed in this Order is that a short sale is a sale of property *by the borrower* with the lenders' consent that is *voluntarily* entered into by the borrower, whereas a foreclosure sale is a sale *by the lender* that is *involuntarily* entered into by the borrower.

A "foreclosure sale" is the "sale of mortgaged property, authorized by a court decree or a power-of-sale clause, to satisfy the debt." Black's Law Dictionary (9th ed. 2009). A "power-of-sale clause" is a "provision in a mortgage or deed of trust permitting the [lender] to sell the property without court authority if the payments are not made." *Id.* In short, because a foreclosure sale is accomplished due to a court order or a clause within the mortgage, the sale itself is done by the lender and *involuntarily* entered into by the borrower.

In contrast, the "short sale" is the "voluntary" sale of mortgaged property by the borrower where the borrower "secures the agreement of the [lender] to release the mortgage upon a bona fide sale to a third party for an agreed upon price below the mortgage loan balance." 2 The Law of Real Estate Financing § 12:10, Short sales. "If the voluntary sales efforts fail, presumably the [lender] could proceed to foreclosure or attempt a restructuring of the loan." *Id.* The short sale alleged here occurred when Plaintiffs sold their home

with Defendants' consent "for an amount insufficient to pay off the amount of the [mortgage] on the property leaving the sale 'short' of a full payoff of the [mortgage]." FAC at 2:14–17 (¶ 2).[26]

The "part of a debt secured by mortgage not realized from sale of mortgaged property" is frequently described as a "deficiency." *In re Prestige Ltd. P'ship–Concord,* 223 B.R. 203, 209 (Bankr.N.D.Cal. 1998) (defining deficiency in the context of Section 580b) *aff'd by* 234 F.3d 1108 (9th Cir.2000); *see also Cornelison v. Kornbluth,* 15 Cal.3d 590, 603, 125 Cal.Rptr. 557, 542 P.2d 981 (1975) (defining a deficiency as "the difference between the fair market value of the property held as security and the outstanding indebtedness [at the time of sale].").

A "short sale" has advantages to both borrowers and lenders and is but one "alternative" that borrowers have "when a home is facing foreclosure."[27] 1 L. Distressed Real Est. § 3B:8, Workout options in general—Short sales to avoid foreclosure. "The benefit to the borrower of a short sale agreement is that the borrower can avoid having a foreclosure on his credit record, avoid the time, frustration, and uncertainty of a foreclosure action, and, if deficiencies are waived by the lender, start fresh without any continuing obligation under the note and mortgage." *Id.* "The advantage to the lender is the savings in time and avoiding the expense of carrying and marketing the property after a fore-closure sale if no third-party purchaser materializes at the foreclosure sale." *Id.*

**b. The plain language of 580b shows that its application is not limited to foreclosure sales or any other mode of sale**

The plain language of 580b shows that its application is not limited only to foreclosure sales or any other specific mode of sale.

First, reading Section 580b as applying only to foreclosure sales or any other specific mode of sale is contrary to the express language of the statute. Section 580b provides that "[n]o deficiency judgment shall lie *in any event* after *a sale* of real property." Cal.Civ.Proc.Code § 580b (emphasis added). The phrase "in any event" and the lack of adjectives modifying the phrase "a sale" evinces the intent to have the statute apply broadly to all types of sales.

Second, had the California legislature wished to limit the application of Section 580b to only certain modes of sale, it could have used the limiting language it adopted in other anti-deficiency statutes. For example, the phrase "in any event after a sale" in Section 580b stands in stark contrast to Section 580d, which applies only where the real property "has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust." *See* Cal.Civ.Proc.Code § 580d

---

**26.** The parties agree that the sale at issue here is a "short sale." The Court recognizes that there are some other definitions of short sale, but the common components of these definitions are that the sale is voluntarily entered into by the borrower with the agreement of the lender and leaves a deficiency. *See e.g.,* 1 L. Distressed Real Est. § 3B:8, Workout options in general—Short sales to avoid foreclosure ("'Short sale' is the term given to a transaction where the mortgagee/lender and other creditors and lienholders having a recorded interest ... in the borrower's property which is in the process of being foreclosed agree to accept less than the full amount due.").

**27.** "For example, there may be certain legal alternatives ... such as giving the home back to the existing creditor through a deed in lieu of foreclosure, permitting the creditor to file a foreclosure, loan modification, or bankruptcy (Chapters 7 or 13) may be appropriate choices for the seller." 1 L. Distressed Real Est. § 3B:8, Workout options in general-Short sales to avoid foreclosure.

("No judgment shall be rendered for any deficiency ... in any case in which the real property ... has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust"); *see also Roseleaf Corp. v. Chierighino,* 59 Cal.2d 35, 43, 27 Cal.Rptr. 873, 378 P.2d 97 (1963) ("[S]ection 580d ... applies if the property is sold under a power of sale, but not if the property is foreclosed and sold by judicial action"). Both during the passage of Section 580d in 1940 and during the amendment of Section 580b in 1963, the California legislature chose to not include clauses limiting the mode of sale in Section 580b.

Third, given the lack of limitations on the mode of a sale in Section 580b, it is unsurprising that several California courts and the Ninth Circuit have expressly rejected Defendants' first argument that 580b applies *only* after a foreclosure sale. *See e.g., Frangipani v. Boecker,* 64 Cal. App.4th 860, 862–64, 75 Cal.Rptr.2d 407 (1998) (holding that Section 580b barred beneficiary of "junior purchase money trust deed" from collecting deficiency where property was "not foreclosed" because beneficiary "cancel[ed] the notice of foreclosure"); *Venable v. Harmon,* 233 Cal.App.2d 297, 302, 43 Cal.Rptr. 490 (1965) (holding that Section 580b applied and "the fact that there has not been a prior sale is of no moment"); *Hersch & Co. v. C & W Manhattan Assocs.,* 700 F.2d 476, 478 (9th Cir.1983) (discussing *Venable* and stating that "it is controlling authority that § 580b applies notwithstanding the absence of a prior sale").

Finally, while there does not appear to be any binding authority addressing whether Section 580b applies to short sales, at least one unpublished California Court of Appeal case has recently followed *Frangipani* to suggest that it does. *See Wright v. Gerson,* 2002 WL 1360014, *1, *4, 2002 Cal.App. Unpub. LEXIS 5686, *1,

*12 (Cal.App. 4th Dist. June 24, 2002) (affirming "judgment for [borrower], finding Code of Civil Procedure section 580b ... precluded [lender] from recovering the balance due on the contract once [borrower] ... sold the property to a third party"). In *Wright,* as in the present case, the borrower sold the property "to avoid the prospect of a foreclosure," but the "sale proceeds" were "not ... sufficient to pay the entire amount owed." *Id.* at *2, 2002 Cal.App. Unpub. LEXIS 5686, at *5. The court rejected the same argument advanced by Defendants here, namely, that "section 580b is inapplicable because ... there was no foreclosure sale or resort to the security." *Id.* at *4, 2002 Cal.App. Unpub. LEXIS 5686, at *12.

Thus, this Court rejects Defendants' interpretation as contrary to the plain language of Section 580b.

**c. Defendants' interpretation essentially allows Defendants to contract with Plaintiffs to waive Section 580b protections, which undermines the purpose of Section 580b**

As previously noted, "Section 580b places the risk of inadequate security on the purchase money mortgagee" in order to accomplish the twin purposes of "stabiliz[ing] purchase money secured land sales" prices by discouraging the mortgagee "from overvaluing" the land and ensuring that a borrowers' "loss is limited" if property values drop. *DeBerard Properties v. Lim,* 20 Cal.4th 659, 663, 85 Cal.Rptr.2d 292, 976 P.2d 843 (1999).

In *DeBerard,* the California Supreme Court held that these purposes of Section 580b are so vital to "stabiliz[ing] the state's economy" that Section 580b can not be waived by contract "in exchange for new consideration following the original purchase money sale." *Id.* at 659, 668–69, 85 Cal.Rptr.2d 292, 976 P.2d 843. In *DeBerard,* after the original purchase money

sale, the borrowers "renegotiate their obligations" with the vender via a "forbearance agreement" that purported to waive Section 580b. *Id.* at 662, 85 Cal.Rptr.2d 292, 976 P.2d 843. The court held that such waiver was void, reasoning that the price stabilization purpose of Section 580b was "to the benefit of all" and thus so important as to overcome the general principle that parties "may waive a statutory provision if a statute does not prohibit doing so." *Id.* at 668–69, 85 Cal.Rptr.2d 292, 976 P.2d 843. The court reasoned that the vender could not "circumvent" Section 580b by contracting for a "waiver of section 580b in exchange for other concessions" because to do so would "flout . . . the very purpose of the rule." *Id.* at 663, 85 Cal.Rptr.2d 292, 976 P.2d 843.

Defendants' interpretation of Section 580b as not applying to the short sales in this case would result in exactly the kind of end-run around Section 580b that *De-Berard* rejected. As in *DeBerard,* after the original purchase money sale, Plaintiffs attempted to renegotiate their obligations with Defendants. Just as the vendor in *DeBerard* argued that the parties' assent to a waiver in the foreclosure agreement exempted the sale from Section 580b, Defendants here contend that the parties' assent to a short sale exempts the sale from Section 580b. Yet, like the vendors in *DeBerard,* Defendants here could have pursued a foreclosure sale due to Plaintiffs' defaulting on their mortgage; Defendants simply opted for the convenience of a short sale.[28] Thus, Defendants essentially seek to impermissibly "circumvent" Section 580b by contracting for a short sale in lieu of a foreclosure sale, a result that

would "flout . . . the very purpose of the rule." *Id.* at 663, 85 Cal.Rptr.2d 292, 976 P.2d 843.

In sum, this Court rejects Defendants' interpretation because it would undermine the purpose of Section 580b by essentially allowing every lender to avoid the statute's protections by contracting for a short sale in lieu of a foreclosure sale.

### d. Defendants' interpretation of Section 580b is not supported by Section 580e

Defendants contend that interpreting Section 580b as applying to short sales would render another anti-deficiency statute, Section 580e, superfluous. While it is unclear whether Defendants rely solely on Section 580e's legislative history or also on its plain language, the Court concludes that neither support Defendants' argument.

### i. The plain language of Sections 580b and 580e show that the former applies to fewer types of mortgages, but more modes of sale

Section 580e bars deficiencies where there is "a deed of trust or mortgage for a dwelling of not more than four units" if:

> . . . the *trustor or mortgagor sells* the dwelling for a *sale price less than the remaining amount of the indebtedness* outstanding at the time of sale, in accordance *with the written consent of the holder* of the deed of trust or mortgage . . .

Cal.Civ.Proc.Code 580e(a)(1), (a)(2) (emphasis added).[29]

The plain language of Section 580b and 580e show that Plaintiffs' interpretation of

---

**28.** Indeed, lenders may agree to short sales because lenders can always "proceed to foreclosure" if the short sales "fail" to find a suitable buyer. *See* 2 The Law of Real Estate Financing § 12:10, Short sales.

**29.** Section 580e also has several other provisions not relevant here, such as the requirement that two conditions to be met to invoke its protections, namely, a "voluntary" transfer of title to the buyer and the "sales proceeds" have been tendered to the lender. *See* Cal. Civ.Proc.Code 580e(a)(1), (a)(2).

Section 580b would not render the Section 580e superfluous because Section 580e applies to more *types of loans* than 580b but to fewer *modes of sale* than Section 580b.

 Regarding the types of loans to which each statute applies, Section 580b applies only to "purchase money"[30] loans, whereas Section 580e applies more broadly. As the California Supreme Court has explained, Section 580b "only" applies to a "standard purchase money mortgage or deed of trust transaction" or a "variation" on that type of transaction for which applying Section 580b "serves the purposes of section 580b." *DeBerard Properties, Ltd. v. Lim,* 20 Cal.4th 659, 665, 85 Cal. Rptr.2d 292, 976 P.2d 843 (1999); *Christopherson v. Allen,* 190 Cal.App.2d 848, 853, 12 Cal.Rptr. 658 (1961) ("[S]ection 580b applies only to situations where purchase money security is involved."). In contrast, Section 580e places no such limitation on the types of mortgages or deeds of trust to which it applies. *Compare* Cal.Civ.Proc. Code § 580e (referring to "a deed of trust or mortgage") *with id.* at § 580b (titled "Purchase money mortgages, etc." and referring to a "deed of trust or mortgage . . . to secure repayment of a loan which was in fact used to pay all or part of the purchase

price"). Thus, the Court concludes that Section 580b is not duplicative of Section 580e because the latter applies to more *types of loans* than the former.

Regarding the modes of sale to which each statute applies, Section 580b states that it applies to "a sale," whereas Section 580e places specific limits on the mode of sale. As previously noted, Section 580b expressly states that it applies to "a sale." Cal.Civ.Proc.Code § 580b. In contrast, Section 580e states that it applies where "the trustor or mortgagor sells the dwelling for a sale price less than the remaining amount of the indebtedness outstanding at the time of sale, in accordance with the written consent of the holder of the deed of trust or mortgage." Cal.Civ.Proc.Code 580e(a)(1), (a)(2).

In addition, interpreting Section 580e as applying to more *types of loans* than 580b but to fewer *modes of sale* than Section 580b is consistent with the format of another anti-deficiency statute, Section 580d. Both Section 580d and 580e contain a broad definition of the type of loan to which they apply.[31] Both Section 580d and 580e contain a narrow definition of the mode of sale to which they apply.[32] Indeed, Section 580e(a)(2) even analogizes to Section 580d, noting that the "obligations

---

**30.** A "purchase-money mortgage" is a "mortgage that a buyer gives the seller, when the property is conveyed, to secure the unpaid balance of the purchase price." Black's Law Dictionary (9th ed. 2009). Similarly, a "purchase-money lien" is a "deed of trust given to a lender to secure repayment of a loan used to pay all or part of the purchase price...." *DMC, Inc. v. Downey Sav. & Loan Assn.,* 99 Cal.App.4th 190, 194, 120 Cal.Rptr.2d 761 (2002).

**31.** *Compare* Cal.Civ.Proc.Code § 580d (applying to "a note secured by a deed of trust or mortgage . . . [except that this] section does not apply to any deed of trust, mortgage . . . issued by the Commissioner of Corporations, or which is made by a public utility . . . .")

*with id.* at 580e(a)(1)–(2) (applying to "a note secured solely by a deed of trust or mortgage . . ."), (d)(2) (excepting that this "section shall not apply to any deed of trust, mortgage, . . . to be issued[ ] by the Commissioner of Corporations, or that is made by a public utility . . . .").

**32.** *Compare* Cal.Civ.Proc.Code § 580d (applying where property "has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust") *with id.* at 580e ((applying where "the trustor or mortgagor sells the dwelling for a sale price less than the remaining amount of the indebtedness outstanding at the time of sale.").

of" the borrower and lenders "shall be treated and determined as if the dwelling had been sold through foreclosure . . . in the manner contemplated by Section 580d." Cal.Civ.Proc.Code § 580e(a)(2).

The Court summarizes the relevant differences in the types of loans and modes of sale of the three anti-deficiency statutes discussed here as follows:

| | Section 580b applies to. . . | Section 580e applies to . . . | Section 580d applies to. . . |
|---|---|---|---|
| **Type of loan** | "Purchase money mortgages, etc.," which includes a "deed of trust or mortgage on a dwelling. . . given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of that dwelling." Cal.Civ.Proc. Code § 580b. The California Supreme Court interprets this phrase to mean a "standard purchase money mortgage or deed of trust transaction" or a "variation" on that type of transaction for which applying Section 580b "serves the purposes of section 580b." *DeBerard Properties, Ltd. v. Lim,* 20 Cal.4th 659, 665 (1999). | "a note secured by a deed of trust or mortgage. . . [except that this] section does not apply to any deed of trust, mortgage. . . issued by the Commissioner of Corporations, or which is made by a public utility. . ." Cal.Civ. Proc.Code § 580d. | "a note secured solely by a deed of trust or mortgage. . .[except that this] shall not apply to any deed of trust, mortgage,. . .to be issued[ ] by the Commissioner of Corporations, or that is made by a public utility. . . . " Cal.Civ.Proc.Code § 580e(a)(1), (d)(2). |
| **Mode of sale** | "a sale." Cal.Civ.Proc. Code § 580b. | "[property] sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust." Cal.Civ. Proc.Code § 580d. The shorthand term for this type of transaction in Section 580d is a **"nonjudicial foreclosure[ ]."** *Nat'l Enterprises, Inc. v. Woods,* 94 Cal.App.4th 1217, 1231 (2001); *Roseleaf Corp. v. Chierighino,* 59 Cal.2d 35, 43 (1963) ("[S]ection 580d. . .applies if the property is sold under a power of sale, but not if the property is foreclosed and sold by judicial action"). | "the trustor or mortgagor sells the dwelling for a sale price less than the remaining amount of the indebtedness outstanding at the time of sale." Cal.Civ. Proc.Code § 580e(a)(1). The shorthand term for this type of transaction in Section 580e is a **"short sale."** *Espinoza v. Bank of Am., N.A.,* 823 F.Supp.2d 1053, 1057 (S.D.Cal.2011). |

This Court is unaware of any case rejecting a broad interpretation of Section 580b as applying to any mode of sale on the grounds that such an interpretation would render Section 580d superfluous. Rather, the California Supreme Court and other California courts regularly interpret Sections 580b and 580d together, without any suggestion that the latter is superfluous. *See e.g., Roseleaf Corp. v. Chierighino,* 59 Cal.2d 35, 41–43, 27 Cal.Rptr. 873, 378 P.2d 97 (1963). Given that a broad interpretation of Section 580b as applying to any mode of sale has never been construed as rendering Section 580d superfluous, and given that Section 580e follows a similar format to 580d, this Court rejects Defendants' argument that a broad interpretation of Section 580b would render Section 580e superfluous.

In sum, this Court concludes that the plain language of Section 580b and 580e show that Plaintiffs' interpretation of Section 580b would not render the Section 580e superfluous because Section 580e applies to more *types of loans* than 580b but to fewer *modes of sale* than Section 580b.

**ii. The legislative history of Section 580e shows that the California legislature passed that statute to expand the type of mortgages to which anti-deficiency protections applied, not the modes of sale**

■ Defendants appear to argue that Section 580e was enacted to remedy Section 580b's failure to apply to short sales. Defendants' argument is squarely contradicted by the legislative history of Section 580e, which shows that the California leg-

islature passed that statute to expand the *type of mortgages* to which anti-deficiency protections applied, not the *modes of sale.* Section 580e was first passed in 2010 and amended in 2011. *See* Stats.2010, c. 701 (S.B.931), § 1; Stats.2011, c. 82 (S.B.458), § 1.

First, the legislative history of Section 590e shows the California legislature *knew* Section 580b applied to short sales. For example, the section of the Senate Floor Analyses devoted to "[e]xisting law" states that "Code of Civil Procedure. 580b ... provide[s] protection to a purchase money note that becomes the subject of a ... *short sale.*"[33]

Second, the legislative history of Section 580e reveals that Section 580e was enacted to extend anti-deficiency protections beyond the purchase money loans covered by Section 580b to include *non*-purchase money loans. As the Assembly Floor Analysis expressly states: "[a]ccording to the author ... [t]he purpose of this proposed legislation is primarily to protect distressed homeowners who have *non*-purchase money recourse loans on residential property...."[34] The same document further states that "[t]his bill seeks to clear up any legal confusion between purchase money and *non*-purchase money loans in regards to short sales...."[35]

The Section 580e legislative purpose of extending protections to non-purchase money mortgages is confirmed by a letter from the bill's sponsor "to clarify [her] intent in authoring Senate Bill 931," which states that, "the purpose of this proposed legislation is to protect distressed home-

---

**33.** Senate Floor Analysis for SB 931 (August 17, 2010), (emphasis added) http://www.leginfo.ca.gov/pub/09–10/bill/sen/sb_0901–0950/sb_931_cfa_20100817_204742_sen_floor.html

**34.** Assembly Floor Analysis for SB 931 (June 30, 2010), (emphasis added) http://www.leginfo.ca.gov/pub/09–10/bill/sen/sb_0901–0950/sb_931_cfa_20100630_172451_asm_floor.html

**35.** *Id.* (emphasis added).

owners who have *non*-purchase money recourse loans on residential property...." [36] This purpose is also evinced in the Senate Floor Analyses, which states that an "ARGUMENT[ ] IN SUPPORT" of the bill is that "homeowners with *non*-purchase money loans have been surprised and torn by the financial outcomes that can result from a short sale." [37]

Thus, this Court concludes that the plain language and legislative history of Section 580e shows that this statute was enacted to expand the *type of mortgages* to which anti-deficiency protections applied, not the *modes of sale.*

### e. Conclusion

In sum, this Court holds, on an issue of first impression, that California Civil Procedure Code Section 580b applies to bar a deficiency after a short sale, that is, a borrower's sale of her home for an amount insufficient to pay off her mortgage done after defaulting on her mortgage and with the consent of her lender.

### d. Plaintiffs have Article III standing and UCL statutory standing

Defendants contend that Plaintiffs lack Article III standing and UCL statutory standing. The Court rejects the both contentions.

### i. Plaintiffs have Article III standing

 Article III of the United States Constitution requires a plaintiff to have "standing" to bring her claim. *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006). One of the standing requirements is that a plaintiff has suffered an "injury in fact," meaning an injury that is: (1) concrete and particularized; and (2) actual or imminent, not conjectural or hypothetical. *Id.; Friends of the Earth v. Laidlaw En-*

*vironmental Services (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

Defendants trot out the ubiquitous canard that Plaintiffs lack Article III standing. This time, the argument is stylized as follows: Plaintiffs alleges that Defendants' breach of the contract—namely, the failure to honor the letter (Exhibit 2) releasing Plaintiffs from paying the short sale deficiency—will result in Defendants demanding payments from Plaintiffs, yet "Plaintiffs fail to allege that they actually made any such payments." *See* Mot. at 20; *see also* FAC ¶ 42 ("[Plaintiffs] are being forced to, or will be forced to, make payments unauthorized by law and contrary to the express agreement of and representations of Defendant Chase.").

 Defendants' argument fails because an Article III injury exists where there is a dispute between parties as to the amount one owes under a contract, regardless of whether that amount has been "paid or not." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir.2008) (rejecting defendants' "argument that [p]laintiff's breach of contract claim fails because, not having paid the ... charges, [p]laintiff has suffered no damages"). The injury exists because an obligation under a contract "is incurred, whether paid or not." *See id.*

Here, the FAC pleads a sufficient Article III injury because Defendants allegedly "breached the agreement ... by seeking a deficiency balance of more. than $56,000.00 from Plaintiffs and further instituting collection efforts against Plaintiffs." FAC ¶ 41. Such allegations demonstrate a dispute between parties as to the amount

---

36. CA S. Jour., 2009–2010 Reg. Sess., No. 263, California Senate Journal, 2009–2010 Reg. Sess., No. 263 (emphasis added).

37. Senate Floor Analyses for SB 931 (August 17, 2010), (emphasis added) http://www.leginfo.ca.gov/pub/09–10/bill/sen/sb_0901–0950/sb_931_cfa_20100817_204742_sen_floor.html

one owes under a contract, which is all that is required.

 In addition, while Defendants do not appear to direct their Article III standing argument to any claims other than that for breach of contract, the Court notes that doing so would be futile. To the extent Defendants challenge Plaintiffs' statutory claims, Defendants are wrong on the law because the injury required by Article III can exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing." *Edwards v. First American Corp.*, 610 F.3d 514, 517 (9th Cir.2010).[38] Furthermore, regarding all of Plaintiffs' claims, a plaintiff suffers an injury sufficient to establish Article III "standing" where she alleges that she "lost ... time spent responding to the" defendant's wrongful conduct and the lost time is "at least ... indirectly attributable to the [defendant's] actions." *Walker v. City of Lakewood*, 272 F.3d 1114, 1124–25 (9th Cir.2001).

Thus, this Court DENIES Defendants' Motion to the extent it seeks dismissal due to Plaintiffs' lack of Article III standing.[39]

### ii. Plaintiffs have UCL statutory standing

 UCL statutory standing can be satisfied where "a person ... has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof.Code § 17204. There are "innumerable ways" in which "lost money or property" can be shown, including where plaintiffs: "(1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 323, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011).

38. In the past few years, some defendants in consumer cases have advanced increasingly strained Article III arguments, perhaps emboldened by the United States Supreme Court's grant of certiorari on *Edwards*. *See First Am. Fin. Corp. v. Edwards*, — U.S. —, 131 S.Ct. 3022, 180 L.Ed.2d 843 (2011). The Supreme Court has since dismissed the writ of certiorari as "improvidently granted." *First Am. Fin. Corp. v. Edwards*, — U.S. —, 132 S.Ct. 2536, 183 L.Ed.2d 611 (2012). Perhaps the Supreme Court realized that reversing *Edwards* would create an unworkable constitutional standard and that permitting a federal judge to decide whether injuries already codified by legislatures are sufficiently "injury-like" to satisfy Article III standing is tantamount to deciding which statutory rights are, in the judge's personal opinion, sufficiently important to bring suit. *See* Kevin Russell, *First American Financial v. Edwards: Surprising end to a potentially important case*, SCOTUSblog (Jun. 28, 2012, 5:09 PM), http://www.scotusblog.com/2012/06/first-american-financial-v-edwardssurprising-end-to-a-potentially-important-case/. Regardless, *Edwards* remains binding precedent on this

Court, despite frequent suggestions to the contrary.

39. Despite finding Article III statutory standing, this Court next discusses Plaintiffs' UCL statutory standing out of an abundance of caution because sometimes a plaintiff can establish Article III standing but not UCL statutory standing. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 324, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011) ("[B]ecause economic injury is but one among many types of injury in fact, the [UCL] requirement that injury be economic renders standing under section 17204 substantially narrower than federal standing under article III, section 2 of the United States Constitution, which may be predicated on a broader range of injuries."); *cf. Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 294–95 (3d Cir.2007) (distinguishing between "[s]tatutory standing," which "is simply statutory interpretation" to determine whether the legislature "has accorded *this* injured plaintiff the right to sue the defendant to redress his injury," and Article III standing, which is regarding "the constitutional power of a federal court to resolve a dispute").

"[D]amage to credit" is a "loss of money or property" within the meaning of the UCL. *See Rubio v. Capital One Bank,* 613 F.3d 1195, 1204 (9th Cir.2010). Thus, "perpetration of [c]redit [r]eports containing inaccurate erroneous information regarding 'due and owing' debts is a sufficient injury to grant Plaintiffs standing" under the UCL. *White v. Trans Union, LLC,* 462 F.Supp.2d 1079, 1080, 1084 (C.D.Cal.2006) (holding that UCL statutory standing was satisfied by allegation that plaintiffs "have suffered ... loss of money or property" due to Defendants "credit reporting practices" such as "falsely declar[ing] [plaintiffs'] discharged debts to be 'due and owing' and thereby inappropriately taint Plaintiffs' credit reports"); *King v. Bank of Am., N.A.,* C–12–04168 JCS, 2012 WL 4685993, *8 (N.D.Cal. Oct. 1, 2012) ("Allegations of a diminished credit score have been found to satisfy the UCL's standing requirement."); *Aho v. AmeriCredit Fin. Services, Inc.,* 10CV1373 DMS BLM, 2011 WL 2292810, *2 (S.D.Cal. June 8, 2011) (holding that UCL statutory standing was satisfied by allegation that plaintiffs' "credit report has been negatively affected by [d]efendant's reporting of the deficiency to credit reporting agencies").

Here, Plaintiffs here have established UCL statutory standing by alleging Defendants' "perpetration of [c]redit [r]eports containing inaccurate erroneous information regarding 'due and owing' debts." *See White,* 462 F.Supp.2d at 1080. For example, regarding their Promissory Estoppel claim, Plaintiffs contend that, "[a]s a proximate result of the foregoing, Plaintiffs ... have been damaged and have suffered detriment in that they have been subjected to ... listing of ... unlawful and improperly claimed 'debt' with credit reporting agencies." FAC ¶ 46. Regarding the Promissory Fraud and Negligent Misrepresentation claims, Plaintiffs contend that they "have had their credit injured by Defendant Chase [LLC] by having ... uncollectible alleged 'debt' listed on their credit reports." *Id.* ¶¶ 49, 56. Regarding their CLRA claim, Plaintiffs allege that Defendant Chase LLC "caused Plaintiffs ... to suffer and sustain damages in degraded credit histories." *Id.* ¶ 60. Finally, regarding the UCL claim, Plaintiffs contend that Plaintiffs' "harm includes injury due to "damage to [Plaintiffs'] credit reports and credit ratings." *Id.* ¶¶ 74(b), 75(b).).

Defendants contend, however, that Plaintiffs have failed to establish UCL statutory standing because Plaintiffs failed to allege that they have incurred any fees or interest as a result of Defendants allegedly reporting false information to credit reporting agencies and because Plaintiffs fail to allege that they have made any payments towards the short sale deficiency. Mot. at 20; Reply at 9.

Given that the Ninth Circuit and published district court cases have recognized that damage to credit *alone* satisfies UCL statutory standing, the Court declines to follow Defendants' unpublished cases suggesting otherwise. None of Defendants' cases distinguished the cases cited above. Furthermore, there are several reasons to doubt the validity of the cases on which Defendants rely. For example, Defendant cites *Gerber v. Citigroup, Inc.,* which held that the pro se plaintiff lacked UCL statutory standing because the relief he sought did not satisfy the "limited" definition of "[r]estitution under the UCL." *See* CIV S07–0785WBSJFMPS, 2009 WL 248094, *7 (E.D.Cal. Jan. 29, 2009). Yet, two years later, the California Supreme Court held that "ineligibility for restitution is not a basis for denying standing under [UCL] section 17204" and "disapprove[d] those cases that have concluded otherwise." *Kwikset Corp. v. Superior Court,* 51 Cal.4th 310, 337, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011).

In addition, two of Defendants' cases appear to have been decided without reaching the merits and thus offer no reasoning for their conclusions. Defendant cites *Wilson v. JPMorgan Chase Bank, NA.*, but that court appears to have dismissed the UCL claim simply due to non-opposition, stating conclusorily that the plaintiff "does not identify any economic losses she has suffered." *See* CIV.2:09–863 WBSGGH, 2010 WL 2574032 (E.D.Cal. June 25, 2010). In *Bankston v. Americredit Fin. Services, Inc.*, the court rejected the plaintiff's contention that certain "credit agency reports [were] a basis for her claim of injury" because "this claim of injury is unpled, and thus, is not properly before the Court." *Bankston v. Americredit Fin. Services, Inc.*, C 09–04892 SBA, 2011 WL 89730, *7 (N.D.Cal. Jan. 10, 2011).

Finally, Defendants fourth case reached its conclusion due to the plaintiff's lack of evidence at summary judgment, whereas Plaintiffs here need only present plausible allegations, not evidence, to survive Defendants' Motion. *See Wright v. Gen. Motors Acceptance Corp.*, 09CV2666 JM AJB, 2012 WL 253157, *5 (S.D.Cal. Jan. 25, 2012) (granting defendant summary judgment because plaintiff "simply fails to identify any evidence or testimony that his economic injury was either the result of" defendants' "reporting of the deficiency to credit reporting agencies").

Alternatively, Plaintiffs have shown UCL statutory standing because they allege they were induced to "enter into a transaction, costing money or property, that would otherwise have been unnecessary." *See Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 323, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011). Defendants' alleged contract with Plaintiffs to release

them from paying the short sale deficiency was a transaction that was unnecessary because, as Plaintiffs contend and as this Court concludes in this Order, California Civil Procedure Code Section 580b already barred the collection of a deficiency after a short sale. Plaintiffs' allegation, supported by Exhibits 1 and 2, show that Defendant conditioned the short sale on Plaintiffs' payment of $3,000 to Defendants, and such payment of $3,000 certainly constitutes lost money.

Thus, the Court DENIES Defendants' Motion to the extent it seeks dismissal of the UCL claim for failure to establish statutory standing.

### e. The FCRA does not preempt any claim

Defendants contend that the Federal Credit Reporting Act ("FCRA"), Section 1681t(b)(1)(F), preempts "all of Plaintiffs' claims, other than [their] CCRAA claim." Mot. at 21. The Court first reviews the relevant statutory provisions and then discusses Defendants' argument as it applies to different portions of the FAC.

### i. FCRA statutory language

The FCRA has three relevant provisions, detailed below, dubbed by this Court as: (1) Section 1681t(b)(1)(F) Preemption Provision; (2) Section 1681t(b)(1)(F)(ii) Preemption Exception; and (3) Section 1681s–2(b)(1) Responsibility.

### 1. Section 1681t(b)(1)(F) Preemption Provision

Section 1681t(b)(1)(F) provides that, with some exceptions, "[n]o *requirement or prohibition* may be imposed under the laws of any State ... *with respect to* any subject matter regulated under ... section 1681s–2 ... *relating to the responsibilities of persons who furnish information to consumer reporting agencies.*" 15 U.S.C. § 1681t(b)(1)(F) (emphasis added).[40] The

---

**40.** Section 1681t contains several provisions regarding the extent to which it is intended to

preempt state laws, the relevant portions of which provide:

Court will refer to this provision as the "Section 1681t(b)(1)(F) Preemption Provision."

### 2. Section 1681t(b)(1)(F)(ii) Preemption Exception expressly exempting CCRAA claims from preemption

One relevant "except[ion]" to the Section 1681t(b)(1)(F) Preemption Provision is that it "shall not apply ... with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996)." 15 U.S.C. § 1681t(b)(1)(F)(ii).[41] The Court will refer to this provision as the "Section 1681t(b)(1)(F)(ii) Preemption Exception."

### 3. Section 1681s—2(b)(1) Responsibility

The FCRA requires credit reporting agencies to adopt "reasonable procedures related to the collection, communication, and use of consumer credit information to ensure fair and accurate credit reporting." *Miller v. Bank of Am., Nat. Ass'n,* 858 F.Supp.2d 1118 (S.D.Cal.2012); 15 U.S.C. § 1681e. As part of this goal, the FCRA sets forth "[r]esponsibilities of furnishers

> (a) Except as provided in subsections (b) ... of this section, this subchapter does not annul, alter, affect, or exempt any person ... from complying with the laws of any State with respect to ... distribution, or use of any information on consumers, ... except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.
> (b) General exceptions
> No requirement or prohibition may be imposed under the laws of any State—
> (1) with respect to any subject matter regulated under—
> ...
> (F) section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—
> ...
> (ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996);

of information to consumer reporting agencies." 15 U.S.C. § 1681s–2; *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1154 (9th Cir.2009).

The responsibility at issue in the present case is a furnisher's responsibility to "report" to credit reporting agencies that "information is incomplete or inaccurate," where the furnisher has "receiv[ed] a notice of dispute" as to that information. *See* 15 U.S.C. § 1681s–2(b)(1); *Gorman,* 584 F.3d at 1154.

### ii. Argument

Defendants argue that "all of Plaintiffs' claims, other than [their] CCRAA claim," are preempted by the Section 1681t(b)(1)(F) Preemption Provision because the non-CCRAA claims are "based on allegations that Chase allegedly supplied inaccurate credit information to credit reporting agencies." Mot. at 21. As discussed below, Defendants' argument relies on an unfair characterization of the FAC and the bases of Plaintiffs' claims.

15 U.S.C. § 1681t; *see also Montgomery v. PNC Bank, N.A.,* C–12–2453 SC, 2012 WL 3670650, *5 (N.D.Cal. Aug. 24, 2012).

41. In addition to the preemption exceptions in Section 1681t, there are also preemption exceptions in Section 1681h(e); the extent to which the exceptions in Section 1681h(e) trump the preemption provisions in Section 1681t(b)(1)(F) is currently the source of a split in authority that has "left district courts in disarray." *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1167 (9th Cir.2009) (noting split in authority but refraining from "decid[ing] this issue"); *Manno v. Am. Gen. Fin. Co.,* 439 F.Supp.2d 418, 424 (E.D.Pa. 2006) (describing in helpful detail the "[t]hree different approaches [that] have evolved," namely, "the 'total preemption' approach, the 'temporal' approach, and the 'statutory' approach" and adopting the statutory approach). Because Plaintiffs have not invoked Section 1681h(e) as a preemption exception, the Court does not address it here.

■ Essentially, Defendants treat federal preemption like a highly-contagious and fatal disease; by including a few stray allegations about inaccurate credit reporting in the FAC, Plaintiffs have contaminated all their non-CCRAA claims and thus these claims must be put down. However, this Court believes a more fitting analogy is that these allegations are like an appendix; some of these allegations are benign—such as the ones about Plaintiffs' injury—and the few dangerous ones can by excised to preserve the body of the claims.

First, the Court concludes that Plaintiffs' UCL and Rosenthal FDCPA claims are preempted only to the extent that Plaintiffs' Rosenthal Act and UCL claims arise from Defendants' inaccurate reporting as described in FAC Paragraphs 63(d) and 73(e). Second, the Court holds that a breach of contract claim is not, as a matter of law, preempted by the Section 1681t(b)(1)(F) Preemption Provision. Finally, regarding the remaining claims, the Court concludes that the allegations of Plaintiffs' injury due to Defendants' false reporting to credit reporting agencies and request for a remedy for that injury do not show that these remaining claims themselves are preempted by the Section 1681t(b)(1)(F) Preemption Provision.

**1. Rosenthal FRCPA and UCL claims**

■ Defendants contend that the following allegations indicate that Plaintiffs' claims are preempted:

- **"Violation of Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788 *et seq.*":** "Defendants ... violated the Rosenthal FDCPA by ... [f]alsely and deceptively reporting, in violation of 15 U.S.C. § 1692e, subdivisions (2), (8), and (10), and California Civil Code §§ 1788.17 ... the deficiencies of Plaintiffs ... to credit reporting agencies as 'late,' 'charged off,' 'collection,' or other derogatory status ... when in fact under California Code of Civil Procedure 580b no such personal liability exists" (FAC ¶¶ 63, 63(d));

- **Violation of Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 *et seq.*":** "Notwithstanding the plain language of [California Civil Code Section] 580b, Defendants ... [f]alse[ ] and deceptive[ ] report[ed] ... the deficiencies of Plaintiffs ... to credit reporting agencies" (*id.* ¶¶ 73, 73(e));

Defendants cite *Miller v. Bank of America,* which held that Section 1681t(b)(1)(F) preempted Plaintiff's UCL claim where the plaintiff alleged that "defendant reported inaccurate information to the credit reporting agencies and failed to conduct a reasonable investigation after being notified that Plaintiff disputed the report." *Miller v. Bank of Am., Nat. Ass'n,* 858 F.Supp.2d 1118, 1124 (S.D.Cal.2012). These allegations comprised the totality of plaintiff's claim under the unlawful prong UCL claim, which in turn was "predicate[d]" on defendant's violation of the FCRA, 15 U.S.C. § 1681s–2. Given that the UCL claim was predicated entirely on the FCRA violation, the court reasoned that "allegations against [d]efendant ... relate *exclusively* to the responsibilities of furnishers of credit information as set forth under sections 1681–2[ ]." *Id.* Because Plaintiffs' UCL claim related "exclusively" to these responsibilities, Section 1681t(b)(1)(F) preempted Plaintiff's UCL claim. *Id.*[42]

---

42. The court also held that the FCRA expressly preempted plaintiff's common law negligence claim, which is a claim that is not relevant to the present case. *See Miller,* 858 F.Supp.2d at 1126–27.

In contrast, in *Guillen v. Bank of Am. Corporation,* the court denied defendant's motion to dismiss and held that Section 1681t(b)(1)(F) did not preempt the plaintiff's claim under the Rosenthal Act, California Civil Code § 1788.17—one of the very statutes at issue here—despite the plaintiff's allegations that the defendant-bank "continued to report the inaccurate information" about "two delinquent mortgages" to credit reporting agencies. 5:10–CV–05825 EJD, 2011 WL 4071996, *2 (N.D.Cal. Aug. 31, 2011) (J., Davila). In addition to the inaccurate reporting allegation, the plaintiff also alleged that the defendant-bank "ultimately referred one of the delinquent mortgages ... for collections." *Id.* at *2. The court reasoned that plaintiff's allegations, taken as a whole, showed that plaintiff's theory was that the defendant-bank's "conduct [was] designed to annoy [and] harass, ... [p]laintiff, that [d]efendants used false representations in their collections attempts, and that [d]efendants had impermissible communications with third parties." *Id.* at *7. Because such annoyance, false representations in the context of collection, and impermissible communications was "conduct aris[ing] from the role of [d]efendants as 'debt collectors' under California Civil Code § 1788.2, rather than from [defendant-bank's] role as a 'furnisher' of credit information per § 1681s–2(b)," Section 1681t(b)(1)(F) did not preempt the Rosenthal Act claim. *Id.*

This Court concludes that this case is far more like *Guillen* than *Miller.* First, while all cases are facially similar in that they involve allegations that defendant-banks reported inaccurate information to credit reporting agencies, only in *Miller* did these allegations comprise the entirety of the preempted claim. *See Miller,* 858 F.Supp.2d at 1124. In contrast, both in *Guillen* and the present case, the plaintiffs' claims include *additional* allegations of "conduct aris[ing] from the role of [d]e-

fendants as 'debt collectors' ... rather than ... as a 'furnisher' of credit information." *See Guillen,* 2011 WL 4071996 at *7. Specifically, both *Guillen* and the present case allege that the defendants attempted to collect the debt that they falsely reported to the credit reporting agencies. *See id.* (defendant-bank "ultimately referred one of the delinquent mortgages ... for collections"); FAC ¶ 11 (Defendant Chase LLC "assigned the collection of this unlawfully claimed deficiency balance 'debt' to debt collectors," who "have continued to ... pursue collection"), 73(b) (Defendants were "[u]ndertaking collection efforts").

Furthermore, unlike in *Miller,* Plaintiffs' UCL claim here is predicated in part on Plaintiffs' CCRAA claim, which survives Defendant's motion because this Court in this Order rejects Defendants' challenges to Plaintiffs' CCRAA claim. *See Montgomery v. PNC Bank, N.A.,* C–12–2453 SC, 2012 WL 3670650, *5 (N.D.Cal. Aug. 24, 2012) (denying motion to dismiss to the extent it sought dismissal of UCL claim, reasoning that a claim for "violation of the California UCL is not preempted [by Section 1681t(b)(1)(F) ] because it is predicated on [defendant's] alleged violation of California Civil Code section 1785.25(a)," a CCRAA claim).

However, the Court agrees with Defendants that Section 1681t(b)(1)(F) Preemption Provision preempts Plaintiff's Rosenthal Act and UCL claim *only to the extent* these claims are *based on the specific allegations quoted above* in FAC Paragraphs 63(d) and 73(e) regarding Defendants' inaccurate reporting. The Section 1681t(b)(1)(F) Preemption Provision applies because the allegations show that the *parts* of these claims that are based on these allegations are: (1) "relating to the responsibilities of persons who furnish information to consumer reporting agen-

cies"; and (2) "regulated under" Section 1681s–2. *See* 15 U.S.C. § 1681t(b)(1)(F). These allegations relate to the responsibility provided in Section 1681s–2, which makes it a furnisher's responsibility to "report" to credit reporting agencies that "information is incomplete or inaccurate." *See* 15 U.S.C. § 1681s–2(b)(1).

Thus, the Court GRANTS Defendants' Motion only to the extent that Plaintiffs' Rosenthal Act and UCL claims arise from Defendants' inaccurate reporting as described in FAC Paragraphs 63(d) and 73(e) and quoted in this Order. The Court DENIES the Motion to the extent it seeks dismissal of the Rosenthal Act and UCL claims under a theory of preemption based on any other allegations.

### 2. Breach of contract claim

 Defendants contend that the following allegation shows that Plaintiffs' Breach of Contract claim is preempted by the Section 1681t(b)(1)(F) Preemption Provision:

> [Defendant Chase LLC] breached the agreement ... by seeking a deficiency balance of more than $56,000.00 from Plaintiffs and further instituting collection efforts against Plaintiffs, including the reporting of this unlawfully claimed 'debt' to credit reporting agencies.

FAC ¶ 41.

Neither party provided case law specifically addressing Section 1681t(b)(1)(F) preemption of breach of contract claims. This Court's own research reveals that the few courts to address the issue hold that a "breach of contract claim ... is not preempted by the FCRA." *Spencer v. Nat'l City Mortg.*, 831 F.Supp.2d 1353, 1356, 1364 (N.D.Ga.2011) (holding Section 1681t(b)(1)(F) did not preempt claim, despite plaintiff's allegation "she suffered approximately $116,997 in damages as a result of [defendant's] false negative reporting to the [credit reporting agencies]").

These courts reason that a breach of contract claim is not preempted by the Section 1681t(b)(1)(F) Preemption Provision because that provision "prohibits only legal duties 'imposed under the laws of any State,'" whereas "requirements voluntarily assumed by contract are not imposed under state law." *Leet v. Cellco P'ship*, 480 F.Supp.2d 422, 432 (D.Mass.2007) (denying motion to dismiss because a "breach of contract claim is not preempted by the FCRA," Section 1681t(b)(1)(F)); *Kavicky v. Wash. Mut. Bank, F.A.*, No. 3:06cv01812, 2007 WL 1341345, at *2 (D.Conn. May 5, 2007) ("[T]he FCRA does not preempt breach of contract claims."); *cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 515, 525–26, 526 n. 24, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (holding that provision in 15 U.S.C. § 1334(b) stating that "[n]o requirement or prohibition ... shall be imposed under State law with respect to the advertising or promotion of" a product did not preempt a claim for breach of express warranty because such a claim is "imposed *by the warrantor*" and "common understanding dictates that a contractual requirement, although only enforceable under state law, is not 'imposed' by the State, but rather is 'imposed' by the contracting party upon itself").

Defendants have cited no authority holding that the Section 1681t(b)(1)(F) Preemption Provision preempts a breach of contract claim. Given Defendants' absence of authority and the excellent reasoning of courts reaching the opposite conclusion urged by Defendants, this Court follows the authorities cited above and holds that a "breach of contract claim ... is not preempted by the FCRA." *Spencer v. Nat'l City Mortg.*, 831 F.Supp.2d 1353, 1356, 1364 (N.D.Ga.2011).

Thus, this Court DENIES Defendants' Motion to the extent it seeks to dismiss Plaintiffs' Breach of Contract Claim as preempted by Section 1681t(b)(1)(F).

### 3. Allegations of injury and resulting damages for claims other than breach of contract and Rosenthal FRCPA

Defendants contend that the following allegations indicate that Plaintiffs' claims are preempted:

- **"Promissory Estoppel"**: "[a]s a proximate result of the foregoing, Plaintiffs ... have been damaged and have suffered detriment in that they have been subjected to ... listing of ... unlawful and improperly claimed 'debt' with credit reporting agencies," FAC ¶ 46.
- **"Promissory Fraud"** and **"Negligent Misrepresentation"**: "Plaintiffs ... have had their credit injured by Defendant Chase [LLC] by having ... uncollectible alleged 'debt' listed on their credit reports" (*id.* ¶¶ 49, 56);
- **"Violation of Consumer Legal Remedies Act, Cal. Civ.Code §§ 1750 *et seq.*"**: Defendant Chase LLC "caused Plaintiffs ... to suffer and sustain damages in degraded credit histories" (*id.* ¶ 60);
- **Violation of Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 *et seq.*"** FAC (Dkt. 12). "The conduct of Defendants ... is also fundamentally unfair because it subjects Plaintiffs ... [to] harm based on a fraudulent business practice.... This harm includes injury due to "damage to [Plaintiffs'] credit reports and credit ratings" (*id.* ¶¶ 74(b), 75(b).).

As previously noted, the Section 1681t(b)(1)(F) Preemption Provision preempts only a "requirement or prohibition ... imposed under the laws of any State...." 15 U.S.C. § 1681t(b)(1)(F). A state law "damages remedy itself is not a 'requirement or prohibition'" within the meaning of the Section 1681t(b)(1)(F) Preemption Provision. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1171 (9th Cir.2009) (holding that Section 1681t(b)(1)(F) did not preempt California claim).

A remedy provided by California law is not a "requirement" because a "requirement" is "a rule of law that must be obeyed." *Gorman*, 584 F.3d at 1171 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005)). In contrast, under California law, a remedy creates no rule of law to be obeyed; a remedy simply *redresses* a violation of a rule of law. *See e.g., Kirby v. Immoos Fire Protection, Inc.*, 53 Cal.4th 1244, 1256, 140 Cal.Rptr.3d 173, 274 P.3d 1160 (2012) (distinguishing between the "gravamen" of a California claim—which is a "violation" of an "obligation"—and its "remedy"—such as a monetary award); *cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 515, 526 n. 24, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (reasoning that statutory phrase "[n]o requirement or prohibition ... shall be imposed under State law" did not preempt "common-law remedy" because statute did not refer to "'liability' imposed under state law ... but instead ... only a '*requirement or prohibition*' imposed under state law").

Essentially, Defendants argument would require this Court to hold that allegations of *injury* due to Defendants' false reporting to credit reporting agencies of a short sale deficiency debt and a request for a *remedy* for that injury constitute a "requirement or prohibition" within meaning of the Section 1681t(b)(1)(F) Preemption Provision.[43] Yet, Defendants cite no au-

---

**43.** Indeed, Defendants characterizes the vast majority disputed FAC allegations as relating to Plaintiffs' "injury." Reply at 11.

thority reading Section 1681t(b)(1)(F) Preemption Provision so broadly, nor can this Court reconcile such a broad interpretation with the authorities cited above.

In sum, the Court holds that the allegations identified in this subsection are regarding the scope of Plaintiffs' injury and remedy for this injury, and thus are not a "requirement or prohibition" within meaning of the Section 1681t(b)(1)(F) Preemption Provision. *Cf. Gorman,* 584 F.3d at 1171. Therefore, the Court DENIES Defendants Motion to the extent it seeks dismissal of Plaintiffs' Promissory Estoppel, Promissory Fraud, Negligent Misrepresentation, CLRA, and UCL claims as preempted by Section 1681t(b)(1)(F).

### f. Failure to state a claim

Defendant argues that Plaintiffs have failed to state a claim for breach of contract because the letter ("Exhibit 2") containing the term that was purported breached is contradicted by another letter ("Exhibit 1") and any oral contract is barred by the statute of frauds. *See* Mot. at 23. Based on this first argument, Defendants next contend that Plaintiffs' reliance on Exhibit 2 is unreasonable, resulting in a failure to state a claim for promissory estoppel, promissory fraud, negligent misrepresentation. *Id.*

### i. Breach of contract

Defendants argue that Plaintiffs have failed to state a claim for breach of contract because the term that was allegedly breached—Defendants' agreement to release Plaintiffs of the short sale deficiency—is not in any contract. Mot. at 22–23. Defendants attack the two bases for Plaintiffs' breach of claim: (1) a December 10, 2009, letter sent by Defendant Chase LLC to Plaintiffs, attached to the Original com-

plaint as Exhibit 2 ("Exhibit 2"); and (2) oral statements.

Regarding a contract based on Exhibit 2, Defendant argues that Exhibit 2 does not create a contract term releasing Plaintiffs' short sale deficiency because Exhibit 2 is contradicted by another letter dated the same day, which is attached to the original complaint as Exhibit 1 ("Exhibit 1").[44] These two letters are, indeed, perplexing. Exhibit 2 states that that "Chase agrees" to "release the lien (the 'Lien') on the Property which secures the Loan and the Note" and seems to refer to itself as "Chase's agreement to release the Lien and Note." Compl. Dkt. 1 Ex. 2. In contrast, Exhibit 1 refers to a "release of JPMorgan Chase Bank, N.A., . . . security interest only" and warns that the "customer is still responsible for all deficiency balances per the terms of the original loan documents." Compl. (Dkt. 1) at Ex. 1.

 However, a contradiction between Exhibits 1 and 2 does not assist Defendants because, absent additional evidence of the parties' intent that resolves the contradiction, the contract will be construed against the drafter—in this case, Defendants. *See* Cal. Civ.Code § 1654; *Hartley v. Superior Court,* 196 Cal.App.4th 1249, 1258, 127 Cal.Rptr.3d 174 (2011) ("We construe ambiguities against . . . the drafting party.").

Regarding a contract based on Defendants' oral representations, Defendants contends that such an oral contract for land would violate California's statute of frauds.

 Defendants' argument fails because Exhibit 2 brings this case out of the statute of frauds. California's statute of

---

44. Defendants also argue that Exhibit 2 is barred by the parole evidence rule. Mot. at 23. This argument fails because Plaintiffs contend that Exhibit 2 *is* the contract; Plain-

tiffs do not seek to introduce the letter to address an ambiguity in another contract. *See* Opp'n at 23.

frauds provides that an "agreement ... for the sale of real property" is "invalid, unless [the agreement], or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent." Cal. Civ.Code § 1624(a)(3). The "writing" to which the statute refers can include "an exchange of letters ... or ... a writing from one party to the other acted upon by the other." *Goodman v. Community Sav. & Loan Ass'n*, 246 Cal.App.2d 13, 23, 54 Cal.Rptr. 456 (1966). Exhibit 2 constitutes such a writing acted upon by Plaintiffs, and thus the statute of frauds does not apply.

Thus, the Court DENIES Defendants' Motion to the extent it seeks dismissal for failure to state a claim for breach of contract.

### ii. Promissory estoppel, promissory fraud, negligent misrepresentation, and UCL claims

Defendants next contend that Plaintiffs fail to state a claim for promissory estoppel, promissory fraud, negligent misrepresentation, and a UCL violation because Plaintiffs' reliance on Exhibit 2 was unreasonable. Yet, Exhibit 2 by itself appears to release Plaintiffs from any short sale deficiency. Given that Exhibit 1 at best creates an ambiguity that must be construed against Defendant as drafter, Plaintiffs' reliance on Exhibit 2 and any oral representations by Defendants was not unreasonable. *Cf. April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 805, 817, 195 Cal. Rptr. 421 (1983) (construing contract

terms that were "inherently contradictory" against defendant and holding that plaintiff could this state a claim for "breach of implied covenant of fair dealing in a contract").

Furthermore, even if Plaintiffs' breach of contract claim fails, this does not mean that Plaintiffs' remaining claims fail per se because "certain types of misrepresentations outside of a contract still may create liability even in the face of unambiguous contractual provisions." *See In re Facebook PPC Adver. Litig.*, 5:09–CV–03043–JF, 2010 WL 5174021 (N.D.Cal. Dec. 15, 2010).

Thus, the Court DENIES Defendants' Motion to the extent it seeks dismissal for failure to state a claim for promissory estoppel, promissory fraud, negligent misrepresentation, and a UCL violation.[45]

### iii. Plaintiffs have not established a CLRA claim because they fail to identify the services provided by Defendant that went beyond the creation of an obligation to pay money

█ A plaintiff may bring a claim under the CLRA when "any person" uses a statutorily prohibited trade practice "in a transaction ... which results in the sale or lease of goods or services to any consumer." *Id.* at § 1770. The CLRA defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." *Id.* at 1761(b).

---

**45.** Defendants also opines that Plaintiffs' original Complaint was misleading because it identified Exhibit 1 as the "written contract" and Exhibit 2 as a "confirming letter," and then described their theory of the breach of contract claim as a breach of the "agreement." Reply at 12. First, this argument is irrelevant because the operative complaint is the FAC, not the original Complaint. Second, a motion to dismiss may only be granted where a plaintiff fails to allege *facts*, not

where the complaint contains an inartfully-articulated *legal theory*. By attaching both Exhibits 1 and 2 to the original Complaint, Plaintiffs put Defendant on notice of the basis for the breach of contract claim. Furthermore, any prejudice to Defendants is alleviated by Defendants' Motion, which has forced Plaintiff to better articulate that their legal theory for breach of contract as based on Exhibit 2.

The California Supreme Court has not addressed "the question whether a mortgage loan, and the activities involved in receiving and maintaining one, falls within the CLRA's definition of a 'good' or a 'service.'" *Hernandez v. Hilltop Fin. Mortg., Inc.*, 622 F.Supp.2d 842, 849 (N.D.Cal.2007). Thus, this Court must apply California law as it "believe[s] the California Supreme Court would apply it." *In re KF Dairies, Inc. & Affiliates*, 224 F.3d 922, 924 (9th Cir.2000).

Defendant cites *Fairbanks v. Superior Court*, in which the California Supreme Court recently held that a life insurance *contract* was not a "service" under the CLRA because an "insurer's contractual obligation to *pay money* under a life insurance policy is not work or labor, nor is it related to the sale or repair of any tangible chattel." *See* 46 Cal.4th 56, 61, 92 Cal. Rptr.3d 279, 205 P.3d 201 (2009) (emphasis added). In addition, Defendants' Motion cites a case interpreting *Fairbanks* to preclude a CLRA claim where the defendant-lender allegedly was "demanding money to which it is not entitled and trying to enforce a rescinded loan" because these allegations "challenged only the validity of the mortgage loan and not any nonancillary services related to the loan." *Consumer Solutions REO, LLC v. Hillery*, 658 F.Supp.2d 1002, 1015, 1017 (N.D.Cal.2009).

However, Defendants' summary of the law is incomplete, as even after *Fairbanks*, "courts in this district have concluded that the CLRA does indeed apply to a real estate transaction" where the lenders' interaction with the borrower goes *beyond* a contract to extent credit. *See Hernandez v. Sutter W. Capital*, C 09–3658 CRB, 2010 WL 539133, *4 (N.D.Cal. Feb. 8, 2010); *Becker v. Wells Fargo bank, N.A., Inc.*, 2:10–CV–02799 LKK, 2011 WL 1103439, *13 (E.D.Cal. Mar. 22, 2011) (dismissing CLRA claim based on *Fairbanks*, but distinguishing case from those where "the

defendant provided additional services over and above the extension of credit") *adopted in relevant part by* 2011 WL 3319577 (E.D.Cal. Aug. 1, 2011).

This Court follows the line of cases holding that a defendant-lenders' "advising plaintiffs and managing their loan, constitute[ ] 'services' as defined by § 1761(b)." *Hernandez v. Hilltop Fin. Mortg., Inc.*, 622 F.Supp.2d 842, 851 (N.D.Cal.2007) (holding that defendant-lender provided a "service" within the meaning of the CLRA where, "in an effort to create an appropriate refinancing package, plaintiffs met with defendants' agent three times before finally agreeing on a payment plan that plaintiffs and defendants found acceptable"); *see also Hernandez v. Sutter W. Capital*, C 09–3658 CRB, 2010 WL 539133, *4 (N.D.Cal. Feb. 8, 2010) (denying dismissal of CLRA claim because defendant-lender provided a "service" within the meaning of the CLRA where plaintiff with minimal English proficiency obtained refinancing due to Defendants' "Spanish-speaking agents and employees ... [who] communicated with Plaintiff in Spanish"); *Jefferson v. Chase Home Finance LLC*, No. C06–6510, 2007 WL 1302984, *3 (N.D.Cal. May 3, 2007) (noting that the loan transactions between a mortgage finance company and the plaintiff involved "more than the provision of a loan; they also include [the] financial services [of managing the loan]"); *Knox v. Ameriquest Mortgage Co.*, No. C05–00240, 2005 WL 1910927, *4 (N.D.Cal. Aug. 10, 2005) (noting that, in the context of predatory lending allegations, "California courts generally find financial transactions to be subject to the CLRA").

This Court is persuaded by the reasoning in these cases, which explain that, in "similar matters involving financial transactions, the California Supreme Court and intermediate appellate divisions have found

the CLRA applicable." *Hernandez,* 622 F.Supp.2d at 849; *see also Kagan v. Gibraltar Sav. & Loan Ass'n,* 35 Cal.3d 582, 596–97, 200 Cal.Rptr. 38, 676 P.2d 1060 (1984) (reversing dismissal of CLRA claim where plaintiff alleged that bank misrepresented that it would not charge a management fees for individual retirement accounts).

However, Plaintiffs have not identified in their Opposition any allegations which would differentiate this case from *Fairbanks,* namely, allegations that Defendants' interaction with Plaintiffs went beyond a contract to pay money. Thus, the Court GRANTS Defendants' Motion to the extent it seeks to dismiss Plaintiffs' CLRA claim. However, the Court DISMISSES WITHOUT PREJUDICE so that Plaintiff may amend, if possible, to include allegations indicating that Defendants' interaction with Plaintiffs in forming the short sale contract went beyond the creation of an "obligation to pay money." *Cf. Fairbanks,* 46 Cal.4th at 61, 92 Cal.Rptr.3d 279, 205 P.3d 201.

### iv. Plaintiffs' CCRAA claim is not conclusorily pled

Defendants contend that Plaintiffs' CCRAA fails to identify a specific credit report that contains an inaccuracy, and thus is conclusory. Mot. at 25. This argument fails because Plaintiffs need not plead the specific report to put Defendants on notice of the basis of their claim.

It is quite apparent from the FAC that the basis for Plaintiffs' CCRAA claim is the Defendants are reporting to credit reporting agencies some or all of a $56,000 debt that Plaintiffs contend they do not owe. The FAC alleges that Defendants are impermissibly seeking "a deficiency balance of more than $56,000.00 from Plaintiffs and further instituting collection efforts against Plaintiffs." FAC ¶ 41. The FAC also alleges that Defendants are "reporting purchase money loans … to

consumer credit agencies as 'late,' charged off,' 'collection' or other derogatory status." *Id.* at ¶ 66. Such allegations are all that is required to meet the notice pleading standard.

Thus, the Court DENIES Defendants' Motion to the extent it seeks dismissal of Plaintiffs' CCRAA claim as too conclusorily pled.

### IV. Disposition

For the reasons stated above, the Court:

1) DENIES Defendants' Motion to the extent it seeks dismissal based on 12 U.S.C. § 1818(i)(1) divest this Court of jurisdiction.

2) DENIES Defendants' Motion to the extent it seeks dismissal based on the primary jurisdiction or equitable abstention doctrines.

3) DENIES Defendants' Motion to the extent it seeks dismissal of all claims due to lack of Article III standing or the UCL claim for lack of statutory standing.

4) GRANTS Defendants' Motion only to the extent that Plaintiffs' Rosenthal Act and UCL claims arise from Defendants' inaccurate reporting as described in FAC Paragraphs 63(d) and 73(e) and quoted in this Order. The Court DENIES the Motion to the extent it seeks dismissal of the Rosenthal Act and UCL claims under a theory of preemption based on any other allegations.

5) DENIES Defendants' Motion to the extent it seeks to dismiss Plaintiffs' Breach of Contract, Promissory Estoppel, Promissory Fraud, Negligent Misrepresentation, CLRA, and UCL claims as preempted by Section 1681t(b)(1)(F).

6) DENIES Defendants' Motion to the extent it seeks dismissal for failure to

state a claim for breach of contract, promissory estoppel, promissory fraud, negligent misrepresentation, and a UCL violation.

7) GRANTS Defendants' Motion to the extent it seeks to dismiss Plaintiffs' CLRA claim but DISMISSES WITHOUT PREJUDICE so that Plaintiff may amend, if possible, to include allegations indicating that Defendants' interaction with Plaintiffs in forming the short sale contract went beyond the creation of an obligation to pay money.

8) DENIES Defendants' Motion to the extent it seeks dismissal of Plaintiffs' CCRAA claim as too conclusorily pled.

Plaintiffs shall file a First Amended Complaint, if at all, *by December 10, 2012.*